UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA        )
                                )
         v.                     )    CRIMINAL NO. 04-10198-MLW
                                )
EDGAR RAMOS                      )
JOHN MEHIA                       )

**GOVERNMENT'S MEMORANDUM IN OPPOSITION
TO DEFENDANT'S MOTION TO SUPPRESS**

The United States of America, by and through its attorneys,
Michael J. Sullivan, U.S. Attorney for the District of
Massachusetts, and Nadine Pellegrini, Assistant U.S. Attorney,
hereby files this Memorandum in Opposition to the Defendants'
Motion to Suppress ("Motion").  By the Motion, the defendants
seek to suppress the physical evidence provided by the Defendant
RAMOS when approached by police officers while parked in an MBTA
lot and the statements of RAMOS made to the MBTA officers and
subsequently made to Immigration and Customs Enforcement ("ICE")
agents.[1]

For the reasons that follow, the Defendants' Motion should
be denied.

1.  Initial inquiry between law enforcement officers and the
Defendant to determine, *inter alia*, identity was not a seizure of
Defendant's person. ("Interrogation relating to one's identity or

_____

[1] As noted, *infra*, Defendant Mehia provides no information
in any document relating to this motion. The government seeks to
have his argument summarily denied.

a request for identification by the police does not, by itself, constitute a Fourth Amendment seizure.") <u>I.N.S. v. Delgado</u>, 466 U.S. 210, 104 S.Ct. 1758 (1984). <u>United States v. Drayton</u>, 536 U.S. 194, 200 (2002). Defendant was neither in custody nor subject to custodial interrogation when first approached by MBTA officers.

2. Officers were permitted to open vehicle doors of a vehicle with tinted windows for purpose of officer safety.

3. Subsequent investigatory detention of the Defendant and the vehicle was correctly predicated upon the totality of the circumstances, including the apparent interstate transportation by the Defendant of persons who possessed incomplete travel documents and who appeared to be present illegally within the United States. Reasonable suspicion is found when based upon "specific and articulable facts which, taken together with rational inferences from those facts reasonably warrant that intrusion." <u>Terry v. Ohio</u>, 392 U.S. 1, 21 (1968).

4. Defendant was subsequently fully advised of his rights by ICE agents in his native language. He signed a document indicating that he both understood and agreed to waive those rights.[2]  Defendant thereafter spoke freely to the agents and

---

[2]This stands in contrast to the Defendant MEHIA who initially responded to both questions by the same agents regarding his understanding and his waiver of rights by responding that he wanted a lawyer. See Attachment A, copy of MEHIA's rights form.

provided appropriate responses to questions put to him.

### **FACTUAL BACKGROUND**

The facts recited below are based on the attached affidavit of ICE Special Agent Michael Perrella[3] and reports provided by MBTA officers and other ICE agents.

On Friday May 28th, 2004, the day before the Memorial Holiday weekend, Massachusetts Bay Transportation Authority ("MBTA")officers responded to a call for a suspicious vehicle at the Sullivan Square Orange Line "T" stop parking lot located in Boston, MA.  A "T" inspector reported that the van containing a large number of individuals had been in the parking lot for several hours.  The van had a temporary license plate from Texas.

When officers approached the parked vehicle, they observed what appeared to be a number of people lying down in the back of the van.  The vehicle had a temporary vehicle registration. The officers requested further information about the vehicle from the driver who was later identified as RAMOS.  The two officers could see movement of other persons in the van but, due to the tinted windows, could not determine exactly how many people were in the van or, more importantly, what those persons were doing. A color photograph of the van and the tinted windows is attached hereto

---

[3]A copy of SA Perrella's affidavit in support of a criminal complaint is attached hereto as Attachment B. The government reserves the right to adduce additional facts at any evidentiary hearing on the Motion.

as Attachment C.  Given the concern for the safety of both
officers, one of the officers opened the van's side door.  The
officers requested identification of the passengers. The
passengers provided Brazilian passports with no indication that
the holders were legally present in the United States. RAMOS gave
the officer an envelope with vehicle information which indicated
that the vehicle was recently purchased. In the same envelope,
there was a list containing, among other things, names; the
notation "pagado" which means "paid" in Spanish; and a
destination.  While RAMOS indicated that he was working for a
tour company and was transporting the "passengers" from Texas to
Massachusetts and other locations along the Eastern seaboard, the
MBTA officer noted that none of the "passengers", five males, had
any luggage.  In order to determine the identity of all of the
individuals within the van and to determine whether the
"passengers" were, in fact, legally within the United States, the
officers transported the "passengers" to the MBTA office at
Roxbury to await the arrival of ICE agents.  The officers
requested that RAMOS and the second driver, later identified as
Defendant MEHIA, to accompany them to the MBTA office. Both RAMOS
and MEHIA agreed.

An ICE agent responded to the MBTA offices and reviewed the
passports provided by the "passengers."  The ICE agent noted
that the Brazilian passports had entry stamps into Mexico.

However, none of the five aliens being transported had the
required United States visa or other form of immigration document
which indicated a legal entry into the United States.

*INTERVIEW WITH RAMOS*

At the MBTA station, after ICE agents arrived, RAMOS was
advised, in his native language of the reasons he was being
detained. He was not asked to answer any questions at this time.
Subsequently, RAMOS was advised of his rights in his native
language. He indicated he understood those rights and agreed to
waive those rights. RAMOS spoke freely and in great detail about
his activities and the activities of others. RAMOS admitted that
he and MEHIA were paid to drive the vehicle in question and its
passengers from Dallas, Texas to New Jersey, Massachusetts, and
North Carolina. He identified his bosses as "Alfonso" LNU and
"Carlos" LNU.  RAMOS indicated that he has made at least six
other trips of the same type, transporting approximately the same
number of persons each time.  He admitted that the "passengers"
do not have tickets, do not have luggage, and are not permitted
to leave until they pay. If a passenger did not provide the money
at the point of the final destination, RAMOS stated that he would
call "Carlos" and await permission from "Carlos" to release the
alien. RAMOS indicated that he would be paid upon his return to
Texas and would receive $525.00 upon his return. (None of the
"passengers" ever returned with him back to the Texas area.)

RAMOS was responsible for collection of the remaining balances from the aliens if they had not already paid in full. Normally, he would collect $500 per alien and provide this money to his bosses.  During these prior trips, he had information from the persons that he was transporting that they entered the United States illegally. He was transporting them to the interior of the United States to their final destination.  The information he previously obtained during these trips including specific details regarding how the aliens were smuggled into the United States and how much they were paying to be smuggled into the United States.

With respect to this most recent trip, RAMOS claimed that he did not know that the aliens were illegally present in the United States when he first encountered them in Dallas. However, during the trip, he spoke with several of the aliens that he was transporting.  During these conversations, RAMOS determined that the aliens were from Brazil.  The aliens told him, among other things, the  amount of money they were paying to be smuggled into the United States; that they had only been in the United States a short time after being smuggled in from Mexico; their means of travel; and how they remained undetected by various immigration authorities while they were being smuggled into the United States.

6

**ARGUMENT**

I.    **THE MOTION SHOULD BE DENIED WITHOUT A HEARING WITH RESPECT TO DEFENDANT MEHIA**

A criminal defendant is not entitled, as a matter of right, to an evidentiary hearing on every motion that he chooses to file.  United States v. Staula, 80 F.3d 596, 603 (1st Cir. 1996).  "A hearing is required only if the movant makes a sufficient threshold showing that material facts are in doubt or dispute, and that such facts cannot reliably be resolved on a paper record."  Id. at 603.  In particular, evidentiary hearings on motions to suppress are required only when a defendant makes a sufficient showing that an illegal search has occurred.  United States v. Lewis, 40 F.3d 1325 (1st cir. 1994).  "To make this showing the defendant must allege facts, sufficiently definite, detailed, and nonconjectural to enable the court to conclude that a substantial claim is presented."  Id.

Here, the Defendant MEHIA has failed to meet this standard. The entire motion refers only to the actions and reactions of defendant RAMOS.  Defendant MEHIA is mentioned by name only in the initial paragraph of the motion and thereafter, is not mentioned at all.  Defendant MEHIA supplies no affidavit containing any facts (nor has he sought leave to provide one), much less facts establishing his entitlement to suppression.

7

See <u>United States v. Gomez</u>, 770 F.2d 251, 253 (1st Cir. 1985)(defendant has burden in motion to suppress to establish reasonable expectation of privacy/standing).

The uncontroverted essential facts, as set forth in the attached affidavit of SA Perrella and as argued below, establish that the Motion to Suppress with respect to Defendant MEHIA is without merit.  Accordingly, the Court should deny the Motion without holding an evidentiary hearing.

**II.  THE MOTION TO SUPPRESS WITH RESPECT TO DEFENDANT RAMOS SHOULD BE DENIED.**

A. Initial Approach to Parked Vehicle was Valid

It is well-settled that not every interaction between an individual and law enforcement officers implicates the Fourth Amendment. Courts have long recognized that there is a continuum of conduct and that the analysis of the application of the Fourth Amendment requires a fluid approach to the ever-changing circumstances of the interaction.

> Street encounters between citizens and police officers are incredibly rich in diversity. They range from wholly friendly exchanges of pleasantries or mutually useful information to hostile confrontations of armed men involving arrests, or injuries, or loss of life. Moreover, hostile confrontations are not all of a piece. Some of them begin in a friendly enough manner, only to take a different turn upon the injection of some unexpected element into the conversation. Encounters are initiated by the police for a wide variety of purposes, some of which are wholly unrelated to a desire to prosecute for crime.

<u>Terry v. Ohio</u>, 392 U.S. 1, 13.

8

In this case, the Defendant was approached because the
parked van in which he was seated aroused the suspicions of an
MBTA inspector.  The Defendant claims that "shortly" after he
pulled in the lot he was approached by law enforcement officers.
However, as the affidavit from SA Perrella makes clear, it was
the fact that the van had been parked for several hours at a
public transportation lot on a day before the Memorial Day
weekend that caught the attention of the inspector. Those
suspicions were relayed to the MBTA police officers who
responded.  The initial approach and questioning by these
officers does not implicate Fourth Amendment concerns.  This
initial interaction was neither a seizure nor a detention.
"Obviously, not all personal intercourse between policemen and
citizens involves 'seizures' of persons. Only when the officer,
by means of physical force or show of authority, has in some way
restrained the liberty of a citizen may we conclude that a
'seizure' has occurred." United States v. Mendenhall, 446 U.S.
544, 552.  Moreover, there is no prohibition against a police
officer approaching an individual and asking that person
questions. "Relevant precedent has made clear that a seizure
within the meaning and purpose of the Fourth Amendment does not
occur when governmental agents approach a pedestrian, identify
themselves as law enforcement officers, and solicit conversation
or request an interview." United States v. Taylor, 956 F.2d 572,

575 (6th Cir. 1992).

    B. <u>Officers were permitted to open door to vehicle for</u>
<u>purpose of Officer safety</u>

    Shortly after the initial approach, however, the
circumstances facing the officers changed.  Due to the van's
tinted windows, while the officers could now determine that there
were persons in the van, the actions of those persons were not
entirely clear.  Officers, in a lawful traffic stop, can order
both the driver and the passengers out of the vehicle. *See*
<u>Pennsylvania v. Mimms</u>, 434 U.S. 106, 108-109 (1977)(holding that
officers may request driver of vehicle to step out of vehicle.
*See also*, <u>Maryland v. Wilson</u>, 519 U.S. 408 (1997)(holding that
officers could also require passengers to step out of the
vehicle.)

    In <u>United States v. Stanfield</u>, 109 F.3d 976, 982 (1997), the
Fourth Circuit held that the logic of the <u>Mimms</u> and <u>Wilson</u>
analysis permitted a police officer to open the doors of a
vehicle with tinted windows to determine whether the vehicle is
occupied by one or several persons and whether the vehicle's
occupants are armed or have access to weapons.  Noting that
passengers present as great, if not greater, risk to officers,
the court found that officers could open the doors to a vehicle
to determine "whether the vehicle is occupied by one or several
persons and whether the vehicle's occupants are armed or have

access to weapons. " <u>Stanfield</u>, 109 F.3d at 982. *See also* <u>United States v. Brown</u>, 334 F.3d 1161, 1169 (U.S.App.D.C.2003)(officer's opening of car door and looking inside held valid). Thereafter, the request of and the production by the passengers of their identification, including passports, cannot be challenged by the Defendant. It is a "well-established rule that a "defendant's Fourth Amendment rights are violated only when the challenged conduct invaded his legitimate expectation of privacy rather than that of a third party." <u>United States v. Pulliam</u>, 405 F.3d 782, 790, citing <u>United States v. Payner,</u> 447 U.S. 727 (1980). RAMOS has no legitimate expectation of privacy with respect to the status of the passengers. <u>United States v. Rodriquez-Hernandez</u>, 353 F.3d 632, 635 (8th Cir. 2003).

Moreover, the officers now possessed the information regarding the potential illegal status of the passengers. Taking the occupants to the MBTA offices to await the arrival of ICE officials was a permissible investigative step. See <u>United States v. Soto-Cervantes</u>, 138 F.3d 1319, 1323 (10th Cir. 1998).

RAMOS was asked to show his license. "A reasonable investigation includes asking for the driver's license, the vehicle's registration, as well as inquiring about the occupants' destination, route, and purpose." <u>United States v. Munroe</u>, 143 F.3d 1113, 1116 (8th Cir.1998). His response was to provide the envelope with the passenger list. There was no search of either

the vehicle or RAMOS. Similarly, there is no evidence or indication that he was forced, coerced or threatened into providing this piece of evidence.   This was his voluntary action.

    C. <u>Statements made by RAMOS was subsequent to voluntary, intelligent and knowing waiver of his rights</u>

    As noted in the statement of facts, RAMOS was advised in his native language as to the reason why he was detained at the MBTA offices. Subsequently, and before speaking to ICE agents, RAMOS was read his rights in his native language.

    "The traditional examination into whether a defendant voluntarily, knowingly and intelligently waived his or her Fifth Amendment rights occurs when a suspect, after receiving the Miranda warnings, makes a confession. The scrutiny in such instances is broad, encompassing not only the nature of the police conduct but also such factors as the suspect's age, education and past criminal experience, and whether the suspect had the capacity to understand both the warnings given him and the consequences of waiving his rights." <u>United States v. Barone</u>, 968 F.2d 1378, 1384 (1st Cir. 1992).

    In this case, RAMOS responded appropriately and accurately to questions regarding whether he understood those rights and whether he was willing to waive those rights. He twice signed his

name to a document indicating both his understanding and his
waiver.  At no time did he indicate that he did not understand
what was said to him.  At no time did he indicate that he was
confused or that he did not wish to speak with investigators.
RAMOS provided detailed information regarding his involvement,
and the involvement of others, in transporting persons from Texas
to various locations throughout the United States.

There is no indication that RAMOS failed to fully comprehend
his rights or the waiver of such or that his admissions were not
voluntary. RAMOS claims that he did not understand that he could
have a lawyer with him, although he fails to explain why this is
so.

Defendant was obviously able to comprehend the questions and
answer appropriately. He was oriented as to date, time, place and
the reason for being in Massachusetts.  He could make inferences
based upon his conversation with the passengers that they were
not legally present in the United States.  There is no indication
he suffered from any mental or physical defect which rendered
incapable of understanding his rights. He could provide his date
of birth and the fact that he became an legal permanent resident
three years ago.

In short, based upon a review of all of the circumstances,
the court should find that there was a knowing, intelligent and

voluntary waiver of his rights by the Defendant and that statements obtained pursuant to that waiver should be admissible upon trial.

## CONCLUSION

The government respectfully requests a denial of the Defendants' Motion to Suppress.

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney


By:  /s/Nadine Pellegrini
     Nadine Pellegrini
     Assistant U.S. Attorney

## CERTIFICATE OF SERVICE

This is to certify that I have this day served upon the person listed below a copy of the foregoing document by depositing in the United States mail a copy of same in an envelope bearing sufficient postage for delivery:

        Catherine Bryne, Esq.
        Federal Defenders Office
        408 Atlantic Avenue, 3rd Floor
        Boston, MA 02210

        Melvis Norris, Esq.
        260 Boston Post Road
        Wayland, MA 01778


        /s/Nadine Pellegrini
        Nadine Pellegrini
        Assistant U.S. Attorney

14