UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 04-10198-MLW |
| | ) | |
| EDGAR RAMOS | ) | |
| JOHN MEHIA | | |

**DEFENDANT RAMOS'S POST-HEARING MEMORANDUM IN SUPPORT OF MOTION TO SUPPRESS PHYSICAL EVIDENCE AND STATEMENTS**

### INTRODUCTION

Defendant Ramos moved to suppress physical evidence and statements and a hearing was held on January 11 and 12, 2007. Defendant files this post-hearing memorandum in further support of his motion.

### FACTUAL BACKGROUND

On Thursday, May 28, 2004, MBTA Inspector Patricia Pitts was required to attend a terrorism training class as part of her job duties. Tr. 31:12-16. Ms. Pitts is not a police officer. Tr. 27:21. Her job as an inspector entails supervising drivers, passenger relations, giving directions to customers and walking around the MBTA station to "make sure it is safe and secure." Tr. 27:16. At the terrorism training class, she was taught to pay attention to things in her work area and that if she saw something to say something. Tr. 31:12-16, 31:23-24, 32:23-24. She was also taught that people writing things down, and "license plates . . . written on cardboard" could both be indicators of terrorist activities. Tr. 34:23-35:3, 33:17-23. Ms. Pitts

further indicated that the MBTA was on a high alert, regardless of whether or not the state or country had a similar alert status.  Tr. 54:2-4.  Ms. Pitts, testified that she had worked for the MBTA for twenty years.  Tr. 27:12-21.  The only evidence about her training was that she had taken the terrorism training class the day before the events leading to the present case took place.  Tr. 31:12-16.  The day after her class, at approximately 6:50 a.m. on May 28, 2004, Ms. Pitts was on her way to work at the Sullivan Square MBTA Station ("Sullivan Square").  Tr. 31:12-16.  Sullivan Square is a busy station used by commuters some of whom park all day in the parking lot.  Tr. 45.  In addition, the MBTA Orange Line (train) and numerous bus routes stop at the station.  Tr. 44, 45.  A large white van legally parked in the Sullivan Square parking lot stood out to her and held her attention.  Tr. 29, 46.  As Ms. Pitts set up at her booth, she noticed that the white van had one person sitting in the driver seat, and one person sitting in the front-passenger seat.  Tr. 30:12-13.  This stood out to her because, in her experience at Sullivan Square, people park and ride, they do not park and sit.[1]  Tr. 31:12-16.  From her booth, Ms. Pitts also noticed several individuals, all males, get out of the van for "just long

---

[1] Ms. Pitts observed the van for only 20 minutes before calling dispatch.

enough to stretch their legs," and saw one of them write something down on a piece of paper. Tr. 35:6-8, 43:13-14.

Ms. Pitts decided to further investigate the van by walking by it just like an ordinary commuter walking through the parking lot would do. Tr. 32:2-3, 48:13-16. However, unlike an ordinary commuter, Ms. Pitts had on her MBTA uniform, consisting of a white shirt, blue tie, blue pants, a blue jacket with an MBTA Inspector badge on the sleeve, and a blue baseball hat with the same MBTA badge on it. Tr. 46:22-25. As she walked by the van, she noticed that the van had tinted windows, but she could still see multiple people in the back of the van. Tr. 40:5-15. She also observed that the van had a paper license plate over a regular license plate. Tr. 32:16-18. While this license plate was paper, it was an officially licensed temporary Texas license plate. Tr. 80:19-21.

About 20 minutes after first noticing the van, consistent with her "see something, say something" training, Ms. Pitts contacted dispatch stating, "I might feel silly after this, but I noticed a van when I came down the ramp and I noticed it has a paper license plate and I also noticed that there were several gentlemen in the van." Tr. 35:11-17, 21-36:4. She further stated that she was probably "stereotyping" because she told dispatch that she thought the men looked Middle Eastern because, like her, they had darker skin. Tr. 35:21-36:4, 57:17-18.

-3-

Within five minutes, MBTA police arrived on the scene.  Tr. 41:12-16.

Two MBTA Police cruisers initially responded to the call for a "suspicious van" at Sullivan Square.  Tr. 62, 65.  One cruiser, containing Officer O'Hara and Officer Silen approached the van's passenger side at an angle so they could get a clear view of both sides of the van, and stopped within fifteen feet behind the van. Tr 64:4-9.  The only exit for the van would be past the cruiser. Tr. 64:4-9.  The second cruiser, driven by Officer Federico, parked opposite the first car.  Tr. 65:13-17.  As the uniformed officers exited their vehicles, they surrounded the van in a "somewhat tactical form," with Officer Federico approaching the driver's side front door at an angle, Officer O'Hara approaching the passenger side front door at an angle, and Officer Silen following behind O'Hara.  Tr. 65:13-17, 67:3-11.  As he approached the van, Officer O'Hara could see some sort of movement, possibly heads, through the tinted windows of the van. Tr. 66:7-10.  The windows were not so dark that you could not see inside at all and there was no testimony that the windows were illegal.  Tr. 82:2-7.

As Officer Federico confronted the driver, Officer O'Hara, fearing for his safety, immediately opened the front passenger side door of the van so that he could see the passenger's hands. Tr. 68:19-25.  As he opened the door, O'Hara asked, "Hey, what

-4-

are you guys doing here?" Getting no response, he again asked,
"What is going on here?" Tr. 70:15-18. He then proceeded to
have the front passenger step out of the vehicle, so that they
were on the same level and so Officer O'Hara could speak with the
passenger. Tr. 15-18. From his position, with the doors open,
O'Hara could see multiple male passengers in the back, "staring
like deer in a headlight." Tr. 71:4-6. Once Officer O'Hara had
the front passenger out of the van, and Officer Federico had the
driver out, O'Hara opened the back passenger doors and had all of
the passengers step out. Tr. 71:8-9. As the passengers were
being removed from the van, Officer Vesqueesy and Sergeant Morris
arrived. Tr. 72:16.

After all passengers were removed from the van, Officer
O'Hara asked the driver for identification, defendant Ramos
handed O'Hara his Texas driver's license and a list of the
passengers in the van. Tr. 72:20-73:2. Next, Officer O'Hara
asked the passengers for identification and received Brazilian
passports from each one. Tr. 73:15-17. After quickly glancing
at the passports and seeing no stamps in them, O'Hara decided the
situation was beyond his training and contacted his sergeant to
determine if Immigration and Customs Enforcement ("ICE") should
be contacted. Tr. 76:15-20. Officer O'Hara testified that at
the time of the stop, he had been a patrolman for approximately
seven and one-half years. He had attended a six month, 800 hour

police academy.  Tr. 60:3-8.  After talking to Sergeant Morris,
O'Hara conducted a search of the van.  Tr. 77:2-5.  Finally, the
officers transported the van's occupants to MBTA headquarters in
two or three marked police cars.  Tr. 77:15-17, 78:14-16.  At
this point, the passengers had been detained by MBTA police for
nearly forty-five minutes.  Prior to being transported, a Spanish
speaking officer "interpreted, to the best he could" that they
were being transported to the police station.  Tr. 77.  The van
remained in the Sullivan Square parking lot.  The officers
retained the passengers' identification and documents, as well as
Ramos and Mehia's wallets, which apparently had also been seized.
Tr. 75-78, 85, 93, 112.

Approximately four hours later, at about 11:45 a.m. I.C.E.
Agent Richard Davies was contacted by his supervisor Agent Cheryl
Bassett and was told to go to the MBTA headquarters to
investigate the situation with the van.  Tr. 83-83.  Agent Davies
arrived at the police station around 12:30 p.m.  Tr. 111:10.
Upon arrival, Agent Davies met with ICE Agent John Lindstrom and
MBTA Detective Sullivan.  Tr. 85:1-9.  Together, the three
conversed and reviewed the passports and documents retrieved from
the passengers.  Tr. 14-23.  After this conversation and document
review, at around 1:30 p.m., Agent Davies contacted Agent Bassett
and determined that all the passengers should be transported to

the JFK Federal Building for further investigation.  Tr. 89:23-25.

For approximately five and one-half hours, from about 8:00 a.m. when they arrived at the MBTA headquarters, until around 1:30 p.m. when they were transported to the JFK Federal Building, Tr. 111:10-12, defendants Ramos and Mehia were kept in the holding area of the station.  Tr. 111:18-19.  It is unclear whether or not the defendants were kept in a cell or were allowed to move around during this extended period of time.  Tr. 15-16.

Before leaving the headquarters, Mehia and Ramos were interviewed by Agent Davies and Agent Lindstrom.  Tr. 115:7. However, the defendants were not advised of their Miranda rights before this interview began.  Tr. 111:4-8.  Because both defendants spoke very little English, the interview was conducted in Spanish by Agent Lindstrom, who speaks very little Spanish. Tr. 110:13-20.  During this interview, defendant Ramos was asked to identify his property, including one wallet containing gas and toll receipts for the trip from Texas to Massachusetts and another wallet containing Ramos's driver's license, resident alien card, social security card, $3,000 in one billfold section and $606 in another section.  Tr 130:20-131:15.  Agent Davies stated that the $3,000 was significant to his investigation.  Tr. 132:9.

At the conclusion of this interview, Ramos and Mehia were handcuffed and transported to the JFK building by Agent Davies and Agent Lindstrom. Tr. 92:19-20, 93:3. The rest of the passengers were handcuffed and transported by other ICE agents. Tr. 93:4. At this point, if the defendants stated they wished to leave, Agent Davies would not have allowed them do so. Tr. 123:10-12.

A few hours after being transported to the JFK building, at approximately 3:40 p.m., defendant Ramos was interrogated by Agent Davies and Agent Bassett. Tr. 140:15-16. Defendant Ramos was interrogated by Agent Bassett in Spanish because Spanish was his native language, he spoke only limited English and was "much more comfortable speaking in Spanish." 110, 111, 112, 157:1-3. Thus Bassett, being a "functional Spanish speaker," conducted the interview while Agent Davies took notes. Tr. 137:6-7, 100:3-23. Agent Bassett, who conducted the interview with Ramos, described herself as not fluent. She could not understand everything that a native speaker could say in Spanish. Nor could she say everything in Spanish that she could say in English. Tr. 154:10-17.

The interview began with Agent Bassett reading Ramos his Miranda rights once, and asking him once if he understood those rights. Tr. 96:1-3, 179:17-20. However, because the agents could not find their standard, translated, written Miranda form,

Agent Bassett had to read the rights from the Spanish side of a
<u>Miranda</u> card she carries with her credentials.  Tr. 141:10-17.
If she had a written <u>Miranda</u> form available to her, Agent Bassett
would have used one.  Tr. 155:2-3.

While Agent Bassett was reading the rights, Agent Davies
improvised a written form ("waiver form") by writing two
questions on a sheet of paper.  Tr. 96:22-97:2.  This "waiver
form" did not contain any of the <u>Miranda</u> rights.  Tr. 98:4-6.
Rather, the document only contained two statements in English
with misspellings and missing words.  The two statements as they
appeared exactly were: "Dou understand your rights" and "Do wish
to speak with these officers without your lawyer present."  Tr.
107:7-11.  Neither "question" had a question mark at the end of
it.  Tr. 156:8-11.  These questions, and not the actual, complete
rights, were provided to defendant Ramos because Agent Davies
believed that these were the most important parts of <u>Miranda</u>.
Tr. 98:12.  There was no evidence as to whether or not defendant
Ramos was able to read English or whether he read the confusing
document prior to signing it.  Tr. 157.  There was no evidence
that defendant Ramos had ever been arrested before or had heard
the Miranda warnings before.

During the hearing, there was some disagreement between the
agents on two issues regarding defendant Ramos's signing of the
improvised "waiver form" and his indication that he understood

his rights.  First, on the document signed by Ramos, there is a note that says "Explained in Spanish" next to the statement "Dou understand your rights."  (See Exhibit 2).  Agent Davies stated that he wrote this because Ramos said something in Spanish indicating he did not understand rights causing Agent Bassett to explain something about the rights to Ramos in Spanish.  Tr. 106:16-107:6.  However, Agent Bassett stated that Ramos did not ask a single question and that she did not explain any of the rights to him.  Tr. 158:1-159:5.

Another point of disagreement between the agents is over what defendant Ramos stated when he indicated he understood his rights and was willing to speak with the agents.  Agent Davies believed that Ramos merely answered "yes" to both questions.  Tr. 99:7-20.  However, on this point, Agent Bassett believed that Ramos actually answered these questions using full Spanish sentences.  For example, she stated that Ramos answered the question "Do you wish to speak to us without a lawyer" by saying "Quiere hablar."  It is important to note, as Agent Bassett agreed, that "Quiere hablar" actually means "You want to speak" and the correct way to say "I want to speak" is "Quiero hablar." On questioning by the Court, Agent Bassett indicated that this was a grammatical error she made during cross-examination.

Once Ramos signed the "waiver form", he was questioned for nearly two hours by the agents.  Tr. 100:25.  Prior to beginning

the questioning of Ramos, Bassett learned information about what
some of the other individuals who had been arrested had stated
about what occurred.  Tr. 165-166.  At the conclusion of the
interview, when told he was under arrest, Ramos asked to speak to
a lawyer, but Agent Bassett could not recall the exact words he
used.  Tr. 150:17-21, 161-162.

### ARGUMENT

**A.    Because Police Officers Lacked Reasonable Articulable
       Suspicion that Van Passengers Were Engaged in Illegal
       Activity, Approaching the Van and Opening the Door
       Constituted an Illegal Seizure of the Van**

**1.    Defendant Ramos has Standing [2] to Challenge the Initial
       Seizure of the Van**

Fourth Amendment rights are personal rights, and as such,
"the first inquiry in examining a fourth amendment claim is
whether the defendant had a legitimate expectation of privacy in
the area searched or the item seized."  United States v. Sanchez,
943 F.2d 110, 113 (1st Cir. 1990); accord United States v.
Goldsmith, 432 F.Supp.2d 161, (D.Mass. 2006)("A 'defendant's
Fourth Amendment rights are violated only when the challenged
conduct invaded _his_ legitimate expectation of privacy rather than
that of a third party.'")(citing United States v. Payner, 447
U.S. 727, 731, 100 S.Ct. 2439, 65 L.Ed.2d 468 (1980)(emphasis in

---

[2] Standing in this context is really a short-hand for
whether the defendant had a reasonable expectation of privacy in
the van.  See United States v. Sanchez, 943 F.2d 110, 113 n.1
(1st Cir. 1991).

Payner)).  In determining this issue, the question "is not

whether an individual chooses to conceal assertedly 'private

activity,' but instead 'whether the government's intrusion

infringes upon the personal and societal values protected by the

Fourth Amendment.'"  Goldsmith, 432 F.Supp.2d at 169 (quoting

California v. Ciraolo, 476 U.S. 207, 212, 106 S.Ct. 1809, 90

L.Ed.2d 210 (1986)(quoting Oliver v. United States, 466 U.S. 170,

182-82, 104 S.Ct. 1735, 80 L.Ed.2d 214 (1984))).  The court often

looks to factors such as,

> ownership, possession, and/or control; historical use
> of the property searched or the thing seized; ability
> to regulate access; the totality of the surrounding
> circumstances; the existence or nonexistence of a
> subjective anticipation of privacy; and the objective
> reasonableness of such an expectancy under the facts of
> a given case.

Sanchez, 943 F.2d at 113 (citing United States v. Aguirre, 839

F.2d 854, 856-57 (1st Cir. 1988); Goldsmith 432 F.Supp.2d at 179

(citations omitted).  "Generally speaking, persons who borrow

cars have standing to challenge searches of the borrowed

vehicles."  United States v. Sugar, 322 F.Supp.2d 85 (D.Mass.

2004)(citing cases).

This is a case where defendant Ramos did have an expectation

of privacy in the van and therefore has standing to challenge the

illegal seizure of the van.  While Ramos is not the owner of the

van, he did borrow the van from its actual owner.  In fact, Ramos

is employed by the van's owner.  Defendant Ramos was the driver
of the van and had control over who used it.

This case is similar to both United States v. Sugar, 322
F.Supp.2d 85 (D.Mass. 2004) and United States v. Maling, 746
F.Supp. 223 (D.Mass. 1990), in which the courts found that the
defendant driver had an expectation of privacy in the vehicle
because, in both cases, the driver, although he was not the
owner, had the owner's permission to use and control the vehicle
over an extended journey.  See Sugar, 322 F.Supp.2d at 94;
Maling, 746 F.Supp. at 229.  Like the drivers in Sugar and
Maling, Ramos had the van owner's consent to use and control the
van for the duration of the journey from Texas to Massachusetts.

Defendant Ramos has standing to challenge the seizure of the
van.  His control over the van, over who used it, and his
permission by the owner to use the van gave him a reasonable
expectation of privacy in the van.

## 2.    A Seizure Occurred when Officer O'Hara Opened Van Door

A brief investigatory stop "constitutes a seizure within the
purview of the Fourth Amendment and, therefore, is subject to the
constitutional imperative that it must be reasonable under all
the circumstances."  United States v. Coplin, 463 F.3d 96, 100
(1st Cir. 2006)(citing United States v. Romain, 393 F.3d 63, 70-
71 (1st Cir. 2004)(citing Terry v. Ohio, 392 U.S. 1, 88 S.Ct.
1868, 20 L.Ed.2d 889 (1968)).  It is well settled that, "not all

-13-

personal intercourse between policemen and citizens involves 'seizures' of person." United States v. Mendenhall, 446 U.S. 544, 552, 100 S.Ct 1870, 64 L.Ed.2d 497 (1980).  However, "when the officer, by means of physical force or show of authority, has in some way, restrained the liberty of a citizen . . . a seizure has occurred." Mendenhall, 446 U.S. at 544; accord Stanley, 915 F.2d at 55.  Thus, a seizure occurs when it is "objectively reasonable for [a] person to believe that he [is] compelled to stay and answer the question [posed by an officer]." United States v. Smith, 423 F.3d 25, 28 (1st Cir. 2005)(citing Mendenhall, 446 U.S. at 533, 100 S.Ct. 1870).

An analysis of First Circuit cases dealing with seizures demonstrates the types of police conduct that do and do not constitute seizures.  Merely approaching an individual and asking to speak with him does not constitute a seizure.  See United States v. Young, 105 F.3d 1, 6 (1st Cir. 1997)(identifying themselves as police and asking "Got a minute?" does not constitute a seizure); See United States v. Sealey, 30 F.3d 7, 8 (1st Cir. 1994)(asking "Hey Stephen, what's up?" does not constitute a seizure).  However, more forceful commands do constitute seizures.  See United States v. Stanley, 915 F.2d 54, 56 (1st Cir. 1990)(yelling "Police, freeze" constitutes seizure).  Furthermore, pulling over a moving vehicle constitutes a seizure.  United States v. Chhien, 266 F.3d 1, 5 (1st Cir. 2001).  And

finally, without question, the physical restraint of a suspect constitutes a seizure.  See United States v. Maguire, 359 F.3d 71, 77 (1st Cir. 2004).

The police conduct in this case was far more than a mere request for conversation.  In the case at bar, two police cars entered the lot from a position that made it impossible for the van to leave without getting around the police cars, and pulled behind the van at angles.  Next, three officers approached the car in a tactical manner, with one approaching the driver's side and the other two approaching the passenger's side.  If this tactical approach to the van was not enough of a show of authority to constitute a seizure, what happened next surely was. As soon as Officer Federico made contact with the driver, Officer O'Hara immediately opened the passenger side door.  The driver and passengers in the van had no opportunity to drive or walk away; Officer Federico was blocking the driver side door, Officer O'Hara not only was blocking the passenger side door, but also made the van inoperable by opening the passenger side door. Furthermore, it is probable that Officer Silen was blocking any exit from the rear passenger side.

Thus, the police conduct of approaching the van tactically and opening the passenger side door would make it objectively reasonable for a person to feel he was not free to leave. Therefore, such conduct constitutes a seizure.

### 3.    Approaching the Van and Opening the Door was not Justified

An officer must have "reasonable articulable suspicion that criminal activity is afoot[,]" before he can lawfully conduct an investigatory stop.  United States v. McKoy, 428 F.3rd 38, 39 (1ˢᵗ Cir. 2005); Romain, 393 F.3d at 71; United States v. Chhien, 266 F.3d 1, 5-6 (1ˢᵗ Cir. 2001)(citations omitted).  "The court must consider whether the officer's action was justified at its inception; and, second, whether the action taken was reasonably related in scope to the circumstances which justified the interference in the first place."  United States v. Stanley, 915 F.2d 54, 55 (1ˢᵗ Cir. 1990)(citing United States v. Sharpe, 470 U.S. 675, 682, 105 S.Ct. 1568, 1573, 84 L.Ed.2d 605 (1985)(quoting Terry, 392 U.S. 1, 20, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889)).  Thus, not only must an officer's initial actions in conducting an investigatory stop be "justified at their inception," any subsequent actions must be "fairly responsive to the emerging tableau - the circumstances originally warranting the stop, informed by what occurred, and what the officer learned, as the stop progressed."  Chhien, 266 F.3d at 6 (citing United States v. Sowers, 136 F.3d 24, 27 (1ˢᵗ Cir. 1998)).

"In evaluating whether reasonable suspicion existed, [the court] 'look[s] at the totality of the circumstances of each case to see whether the detaining officer ha[d] a particularized and objective basis for suspecting legal wrong doing.'"  United

-16-

States v. Monteiro, 447 F.3d 39, 43 (1ˢᵗ Cir. 2006)(citing United
States v. Arvizu, 534 U.S. 266, 273, 122 S.Ct. 744, 151 L.Ed.2d
740 (2002)).  While an officer is allowed "to draw on [his] own
experience and specialized training, in making a vehicle stop,
. . . an officer's reliance on a mere 'hunch' is insufficient to
justify a stop."  Id. (internal citations omitted).

     To begin the Terry two-prong analysis, the Court must first
determine whether or not the officers were justified in
approaching the van.  However, because the officers lacked
reasonable articulable suspicion that the passengers were
committing a crime, this Court should determine that the
officers, in fact, were not justified in approaching the van.

     The government contends that there was reasonable
articulable suspicion to approach the van because Ms. Pitts
observed what she perceived to be Middle Eastern men, sitting in
a van with a legally issued temporary license plate in the
Sullivan Square parking lot and at one point, several males got
out of the van and one of them wrote something down.  However,
some of these factors should not be considered in the reasonable
articulable suspicion analysis and others should be given little
weight.  As such, the police did not have reasonable articulable
suspicion to approach the van.

    **a.   Ms. Pitts' Knowledge Should Not be Attributed to the Responding Officers Under the Collective Knowledge Rule**

It is generally permissible to determine probable cause or reasonable suspicion on the basis of the collective information known by all of the law enforcement officers involved in an investigation.  Whiteley v. Warden, 401 U.S. 560 (1971).  "Under the "fellow-officer" rule, law enforcement officials cooperating in an investigation are entitled to rely upon each other's knowledge of facts when forming the conclusion that a suspect has committed or is committing a crime."  United States v. Meade, 110 F.3d 190, 193 (1st Cir. 1997).  The rationale behind this doctrine is that police officers have the experience, qualifications and expertise to make their observations reliable.  See United States v. Ventresca, 380 U.S. 102 (1965) (observations of fellow officers engaged in common investigation plainly a reliable basis for a warrant applied for by one of the officers); cf. United States v. Arvizu, 534 U.S. 266 (2002)(inferences drawn by an experienced border patrol agent credited in finding that under totality of circumstances agent had reasonable suspicion to support vehicle stop).

However, Ms. Pitts does not fall under this doctrine as she does not share the qualifications or experience of a police officer or a law enforcement officer.  Officer O'Hara testified that at the time of the stop, he had been a patrolman for

-18-

approximately seven and one-half years.  He had attended a six month, 800 hour police academy.  Ms. Pitts, who is not a police officer, testified that she had worked for the MBTA for twenty years.  The only evidence about her training was that she had taken the terrorism training class the day before the events leading to the present case took place.  Ms. Pitts job entails "customer relations," giving directions, and walking around the station to make sure it is safe.  There was no evidence that Pitts had received any police training which would make her observations plainly reliable.  See United States v. Ventresca, 380 U.S. at 111.

In addition, there is no evidence that the fact that Ms. Pitts observed one man writing something down was ever communicated to the MBTA police officers who made the stop.  Thus this information should not be considered in assessing the totality of the circumstances.  Cf. United States v. Meade, 110 F.3rd 190, 194 (1st Cir. 1997)(collective knowledge presupposes flow of information from those with knowledge to those lacking).  Officer O'Hara received information from dispatch of a suspicious vehicle with several males who appeared to be Middle Eastern getting in and out.  The dispatch tape indicates that O'Hara was also told that the van had a "paper plate."  While this license plate was paper, it was an officially licensed temporary Texas

license plate.  This fact should have weight in the reasonable articulable suspicion analysis.

### b. The Fact That Passengers Were Perceived to Be Middle Eastern Should Not Be Considered in Reasonable Articulable Suspicion Analysis, or in the Alternative Should Be Given Little Weight

Race, standing alone, is never enough to create reasonable articulable suspicion to seize an individual.  See United States v. Brignoni-Ponce, 422 U.S. 873, 95 S.Ct. 2574 (1975).  Only in certain limited situations have courts held that race and ethnicity can be factors in determining if reasonable articulable suspicion existed.  These are limited to, (1) where individuals of a certain race or ethnicity are highly likely to commit the crime being investigated, e.g., Brignoni-Ponce, 422 U.S. at 886-87, and (2) where race was included in a description of the suspected perpetrator of a crime.  See, e.g., United States v. Simpson, 992 F.2d 1224, 1226 (D.C.Cir. 1993).

In Brignoni-Ponce, the Court stated that race was an acceptable factor, because "the likelihood that any given person of Mexican ancestry is an alien is high enough to make Mexican appearance a relevant factor."  Id. at 886-87.  However, the court also said that Mexican ancestry by itself is not enough to "justify stopping all Mexican-Americans to ask if they are aliens."  Id. at 886-87.  Under Brignoni-Ponce this Court would need to find that "the likelihood that any given person of [Middle Eastern] ancestry is [a terrorist] is high enough to make

[Middle Eastern] appearance a relevant factor" to find reasonable articulable suspicion supported by Middle Eastern appearance. There is no basis for such a finding. See Brignoni-Ponce, at 886-87. Moreover, the impropriety of such a finding is further supported by the Ninth Circuit's decision in United States v. Montero-Camargo, 208 F.3d 1122 (9th Cir. 2000), which calls into question the current viability of allowing Mexican ancestry to be a factor because of the severe demographic changes that the United States has undergone since the Brignoni-Ponce decision.[3]

The second set of cases that allow race to be considered deal with situations in which a description of the suspect of a specific crime is given and the defendant matches that description. See, e.g., United States v. Simpson, 992 F.2d at 1226. This doctrine is also inapplicable as no description of a suspect of a perpetrated crime was ever given to the officers,

---

[3].99% of individuals living within a half-mile radius and 1.3% of individuals living within a mile radius of Sullivan Station reported Arab ancestry, according to a tabulation of surveyed households reported in the U.S. Census Summary File 3. U.S. Bureau of the Census (2002). The Arab population in the area around Sullivan Station is somewhat greater than in Boston as a whole, where individuals of Arab ancestry comprise .99% of the population. G. Patricia de la Cruz & Angela Brittingham, U.S. Census Bureau, The Arab Population: 2000 7 tbl.3 (2003). The US Census reports that Boston has one of the ten largest Arab populations in the United States. Id. at 7 tbl.3. A Zogby poll conducted by the Arab American Institute found that the U.S. Census underreported the Arab population by a factor of three. Arab American Institute, Massachusetts Fact Sheet (2003), http://www.aaiusa.org/arab-americans/22/demographics.

and thus, the officers could not have thought that these individuals matched that nonexisting description.

Furthermore, the facts of this case highlight the inherent dangers of considering race and ethnicity, and more specifically Middle Eastern descent, when determining if reasonable articulable suspicion exists. Ms. Pitts, who herself is African-American, stated that the reason she thought the individuals in the van were Middle Eastern was because, like herself, "they had darker skin." Such a broad statement demonstrates that, in Ms. Pitts' view, anyone that is not white could be considered to be of Middle Eastern descent. This outlook is reinforced by the fact that the people she thought were Middle Eastern were in fact either Mexican or Brazilian. It would be improper for this Court to consider a factor that could encompass such a large number and wide variety of people.

Based on the above discussion, this Court does not have the legal authority to consider the defendant's perceived Middle Eastern descent in considering if there was reasonable articulable suspicion in this case. However, in the alternative, if this Court does find it has the legal authority to consider this perception, based on the facts, the Court should give this factor little or no weight in its reasonable articulable suspicion determination.

-22-

As stated above, Ms. Pitts was wrong in her perception. She believed the passengers were Middle Eastern when they were really Hispanic. Admittedly, "[s]tops premised on mistakes of fact . . . generally have been held constitutional so long as the mistake is objectively reasonable." United States v. Coplin, 463 F.3d 96, 101 (1st Cir. 2006)(Petition for certiorari filed Dec. 13, 2006 No. 06-8740)(citing United States v. Miguel, 368 F.3d 1150, 1153 (9th Cir. 2004); United States v. Cashman, 216 F.3d 582, 587 (7th Cir. 2000)). However, as the language in Coplin makes clear, the mistake must have been objectively reasonable. The mistake in Coplin was objectively reasonable because the officers relied on their training in interpreting their in-car computer system to determine if the driver's license was suspended. In Coplin the court gave a description of a similar case, United States v. Fox, 393 F.3d 52 (1st Cir. 2004)(vacated on other grounds), where the Court found that the officer properly stopped the defendant because the officer "reasonably believed . . . that the [defendant's license] plate light was not functioning," even though soon after the stop the light was working. Coplin, 463 F.3d at 101-102.

### c.    The Tinted Windows Do Not Support Reasonable Articulable Suspicion

The circumstances of this case indicate that the presence of tinted windows do not support reasonable articulable suspicion. There is no evidence in this case that the tinted windows were

illegal.  Cf. United States v. Harrell, 268 F.3d 141, 148-149

(2nd Cir. 2001)(where deeply tinted windows, itself a traffic

violation, it can furnish probable cause).  Tinted windows are

common.  United States v. Diaz, F.2d 163, 165 n.5 (5th Cir.

1992).  There was no testimony concerning officer's experience

linking tinted windows with illegal activity.  Cf. United States

v. Quintana-Garcia, 343 F.3d 1266, 1268 (10th Cir. 2003).  Tinted

or heavily tinted windows alone do not rise to the level of

reasonable suspicion.  United States v. Guerrero-Barajas, 240

F.3d 428, 433 (5th Cir. 2001).  Other cases that consider tinted

windows allow this fact to be used only when determining if the

officers had reasonable articulable suspicion that their safety

was in jeopardy and therefore, could act to protect their safety.

See United States v. Stanfield, 109 F.3d 976 (4th Cir. 1997);

United States v. Thomas, 363 F.Supp. 2d 84, 92(D.Connecticut

2005).

> ### d.  The factors combined do not support reasonable articulable suspicion to approach the van or open the door

The officers did not have reasonable articulable suspicion

that the van's passengers were engaged in criminal activity.

Prior to opening the door to the van and reviewing passports,

there was no indication that they suspected illegal importation

of aliens.  In fact, Officer O'Hara stated that it was not until

after he had removed all of the passengers from the van,

collected and reviewed their documents, that he decided to seek I.C.E. involvement. The officers were well into the seizure before any reasonable articulable suspicion of immigration violations became apparent. Thus the only criminal activity that the government can point to is terrorism. The collective observations of the officers simply do not supply the requisite reasonable articulable suspicion that criminal activity was afoot. Rather, the officers' reaction is more in line with a "mere hunch" based upon prohibited racial profiling.

First, the perceived race of the individuals should not be considered. Neither should the fact that van's windows were tinted. The van had an officially issued temporary license plate. The only things that can be considered suspicious about these individuals was that they were sitting in a van with a legal temporary license plate, in a legal parking space in a large, busy MBTA station and at one point one of the individuals wrote something down. These factors are not sufficiently particularized to conclude that the officers had the reasonable articulable suspicion necessary to seize the van by opening the van door.

There are no cases which support a seizure based upon such minimal "suspicious" activity. Compare <u>United States v. Stanley</u>, 915 F.2d 54 (1st Cir. 1990)(high-crime area, at 12:15 A.M. defendant in parked car in parking lot next to a bar, officer's

observation of defendant's conduct leaning towards console, faint light in the car, officer's experience with drug investigations supported suspicion of drug activity); United States v. Romain, 393 F.3d 63 (1st Cir. 2004)(police justified in briefly detaining defendant where had received call for man with a gun, went to apartment and entered with consent, encountered angry man inside and woman in apartment said he was armed); United States v. Young, 105 F.3d 1 (1st Cir. 1997)(reasonable suspicion where officers saw three individuals, one matched description of three armed robbers who had been spotted in area, when police approached one of group who officers recognized as a "bad guy" walked away from group, officers observed gun in defendant's waistband); United States v. Bailey, 417 F.3rd 873(8th Cir. 2005)(reasonable suspicion justified protective frisk where at 1:00 A.M. defendant using what appeared to be disconnected phone in poorly lit parking lot, in high-crime area adjacent to gas station where car jacking had been attempted days before and defendant attempted to hide something when approached and lied about talking on the phone); United States v. Espinosa, 433 F.Supp. 2d 186, 189-190 (D. Massachusetts 2006)(on appeal)(seizure not justified in stopping white extended passenger van containing several passengers with tinted windows and bearing Texas license plates, which was similar to three similar passenger vans that were stopped in 2004 transporting

illegal aliens and where van was registered to man whose name had appeared in phone records during prior investigation for human smuggling.  "If the intrusion here is constitutional, then it would appear that all stops of passenger vans with Texas plates and multiple passengers in the Boston area would be constitutional.")

In United States v. Burton, 228 F.3d 524 (4th Cir. 2000), officers approached defendant without reason to suspect he was engaged in criminal activity, then felt "uneasy about their safety" because defendant refused to answer questions or remove his hand from his coat pocket.  There as here they were not justified in conducting a protective search.  Id.  In the absence of reasonable suspicion, the officer's alternative was to "avoid a person he considers dangerous."  United States v. Burton, 228 F.3d at 528, quoting Terry, 392 U.S. at 32.  Nor were the officers justified in opening the door, in the absence of reasonable suspicion of wrongdoing, merely on the basis of a fear for their safety.  Cf. United States v. Lott, 870 F.2d 778 (1st Cir. 1989)(Where there was no evidence that police had reason to believe that the defendant were armed or that there were weapons in the car, the officers did not fear for their safety and the search of the car was unjustified).

### e. Opening the van door was an illegal search not reasonably related in scope to the circumstances which justified the approach

In the alternative, even if the Court does find that the officers were justified in approaching the van, the seizure and search were illegal because Officer O'Hara's action of opening the van door was not reasonably related in scope to the circumstances which justified the officers' approach of the van. See Stanley, 915 F.2d at 55 (citations omitted).  Under this prong of the Terry test, "[v]ehicle searches are . . . permissible where officers 'possess[] a reasonable belief based on 'specific and articulable facts which . . . reasonably warrant' the officer in believing that the suspect is dangerous and the suspect may gain immediate control of . . . weapons' in the vehicle."  United States v. Ivery, 427 F.3d 69, 72 (1st Cir. 2005)(citing Michigan v. Long, 463 U.S. 1032, 1049, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (quoting Terry, 392 U.S. at 21, 88 S.Ct. 1868)).  In other words, '[i]t is insufficient that the stop itself is valid; there must be a separate analysis of whether the standard for pat frisks have been met."  United States v. McKoy, 428 F.3d 38, 39 (1st Cir. 2005).

Police officers are not entitled to search anyone they briefly detain.  To have an adequate foundation for even such limited searches, the officer "must have constitutionally adequate, reasonable grounds for doing so."  Sibron v. New York,

392 U.S. 40, 64 (1968).  The officer must be able to "point to particular facts from which he reasonably inferred that the individual was armed and dangerous."  Id.

An officer can order both the driver and any passengers from a vehicle that was lawfully stopped.  See Pennsylvania v. Mimms, 434 U.S. 106, 108-09 (1977)(holding that officers can order a driver out of a lawfully stopped vehicle); Maryland v. Wilson, 519 U.S. 408, 410 (1997)(extending Mimms to allow officers to order passengers out of a lawfully stopped vehicle).  However, a police officer's act of opening a door to a stopped vehicle constitutes a greater invasion of privacy than merely ordering the passengers out of the vehicle.  See State v. McGuire, 695 N.W.2d 904, *** 3-***4 (Wis. Ct. App. 2005)(table decision).  In McGuire the court reasoned:

> [t]here is a significant difference between ordering one out of a car and opening a car door without warning.  In the former case, the occupant has the opportunity, before opening the door and leaving the car, to safeguard from public view matters as to which he has a privacy interest.  Suddenly opening a car door is unconstitutionally intrusive because the police officer thereby surprises the occupant when the latter is entitled to consider his private affairs secure from outside scrutiny.

Id. at ***3 n.4 (citations omitted).  The opening of the van door was an unlawful search which exceeded the scope of the Terry stop because the officers did not "possess[] a reasonable belief based on specific and articulable facts . . . that the suspect is dangerous and the suspect may gain immediate control of . . .

weapons in the vehicle." <u>Ivery</u>, 427 F.3d at 72 (citations and internal quotation marks omitted).

The government relies on the fact that the officers had a difficult time seeing into the van because its windows were tinted. Some cases have allowed this fact to be considered when determining if there was a suspicion that the suspects were armed and dangerous. <u>See, e.g.</u>, <u>United States v. Stanfield</u>, 109 F.3d 976 (4th Cir. 1997); <u>United States v. Thomas</u>, 363 F.Supp.2d 84 (D.Conn. 2005). However, in these cases, tinted windows was only one of several factors that led the officers to believe they were in danger. <u>Stanfield</u>, 109 F.3d at 977-79; <u>Thomas</u>, 363 F.Supp.2d at 91-92. In <u>Stanfield</u>, a car was parked illegally in the middle of the street, in a high crime area, and the driver was talking to a known drug dealer. In <u>Thomas</u> the police were responding to a 2:45 A.M. call for loud music emanating from a van, which was parked in a high drug trafficking and violent crime area.[4] Thus, this Court should consider the van's tinted windows as the only factor in this analysis. Legally tinted windows, by themselves, should not allow an officer to unlawfully search a vehicle. <u>Cf</u>. <u>United States v. Guerrero- Barajas</u>, 240 F.3rd 428, 433 (5th Cir. 2001)("tinted or heavily tinted windows do not rise to the level of reasonable suspicion.")

---

[4]Note that in <u>Stanfield</u> and <u>Thomas</u> there was no question that the police had reasonable articulable suspicion to approach and stop the vehicles.

In this case, the officers did not have a reasonable belief that the passengers in the van were armed and dangerous. There was no evidence that Sullivan Square is a high crime area. All the events transpired between 7:00 A.M. and 8:00 A.M. This daylight time is the usual time for people to be arriving at a commuter station. The passengers were not observed with any weapons, nor was there any evidence of criminal activity that would indicate the individuals may be armed. As such, there were no "specific and articulable facts" that could have led the officers to "possess[] a reasonable belief . . . that the [defendants] were dangerous and . . . may gain immediate control of . . . weapons." Ivery, 427 F.3d at 72 (citations and internal quotation marks omitted).

Officer O'Hara's act of opening the van door constituted an impermissible search of the vehicle that exceeded the scope of the original Terry stop. All evidence obtained by and flowing from the unlawful Terry stop should be suppressed. Wong Sun v. United States, 371 U.S. 471 (1963); See, Acosta-Colon, 157 F.3d at 21-22 (discussing 'fruit of the poisonous tree' doctrine in the context of illegal detention).

**B.** **All Statements Obtained From Defendant Ramos Were In Violation Of Miranda**

   **1.** **Because a De Facto Arrest Occurred When the Passengers Were Transported to MBTA Headquarters, Miranda Was Required Before Interrogation Could Occur**

Any seizure exceeding a brief investigative detention is an arrest, whether or not that nomenclature and the associated procedures are used.  See, Dunaway v. New York, 442 U.S. 200, 212-13 (1979) ("The mere facts that petitioner was not told he was under arrest, was not 'booked,' and would not have had an arrest record if the interrogation proved fruitless . . . obviously do not make petitioner's seizure even roughly analogous to the narrowly defined intrusions involved in *Terry* and its progeny.") Where a de facto arrest has occurred, Miranda warnings are required before questioning.  United States v. Trueber, 238 F.3d 79, 92 (1st Cir. 2001).  "There is no scientifically precise formula that enables courts to distinguish between investigatory stops . . . and . . . 'de facto arrests'."  United States v. Trueber, 238 F.3d at 93 (citing United States v. Zapata, 18 F.3d 971, 975 (1st Cir. 1994).  "The 'ultimate inquiry' . . . is whether there was "a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest."  Id. (citing Thompson v. Keohane, 516 U.S. 99, 112, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995)).  In determining if a "restraint on freedom of movement" of the degree associated with formal arrest occurred, the court should look at "all of the circumstances surrounding the interrogation."  Id. (citation omitted).  The inquiry should be based on whether a reasonable person would have believed he was under arrest.  Id.  "Relevant circumstances

include, among other inquiries, "whether the suspect was
questioned in familiar or at least neutral surroundings, the
number of law enforcement officers present at the scene, the
degree of physical restraint placed upon the suspect, and the
duration and character of the interrogation." Id. (citations
omitted). "[W]here the detention is distinguishable from, yet
has some features normally associated with, an arrest-the
analysis must revert to an examination of whether the particular
arrest-like measures implemented can nevertheless be reconciled
with the limited nature of a Terry-type stop. United States v.
Acosta-Colon, 157 F.3d 9, 15 (1st Cir. 1998).

    In certain Terry stops even highly coercive behavior on the
part of police will not constitute a de facto arrest. In United
States v. Taylor, 162 F.3d 12 (1st Cir. 1998), the First Circuit
held that a de facto arrest did not occur despite the fact that
(1) at least one officer drew his gun; (2) ten to twelve officers
were on the scene; (3) passengers were placed face down on the
ground and pat-frisked; (4) officers blocked the car with their
police cruisers; and (5) the detention lasted thirty minutes.
See Id. at 21. Rather, because the officers were investigating a
drug crime, with inherent elements of danger, based on
information from an informant, the Court found the officers'
actions justified. Id. at 21. The Court also focused on other
factors it found relevant including (1) the defendant was not

placed in handcuffs; (2) the officers did not treat the defendant harshly; (3) the officers did not tell the defendant he was under arrest; (4) the defendant was not told he was not free to leave; (5) the officers immediately re-holstered their guns when the passengers were secured; and (6) all events occurred on a public street.  Id. at 22.

Taylor demonstrates what the police can do when they are justified in conducting a Terry stop.  The analysis in Taylor is consistent with the standard set forth in Acosta-Colon that examines whether, in the absence of a full blown arrest, the arrest-like measures taken by the police are reconcilable with the justified Terry stop that was undertaken.  Acosta-Colon, 157 F.3d at 15.

In this case, because that the Terry stop was not justified by reasonable articulable suspicion, it is defendant's position that any arrest-like measures taken by the police were not allowable and amount to a de facto arrest.

If the Court does find that the original stop was justified, a de facto arrest still occurred when the passengers were transported to MBTA headquarters.  At this point, the van had been surrounded in a tactical manner by three officers, Officers Federico, O'Hara and Silen, one of the officers opened the van's passenger side door, and the passengers had been removed from the van.  As they were being removed, two more officers, Officer

Vesqueesy and Sergeant Morris, arrived.  The passengers were held
outside of the van for almost forty-five minutes while the
officers inspected their identification and searched the van.
Finally, they were placed in numerous police cars and transported
to MBTA headquarters.  At this time, the officers were still in
possession of the passengers' identification and the paperwork
for the van.  See United States v. Ienco, 182 F.3d 517 (7th Cir.
1999) (illegal de facto arrest where suspects' wallets,
identification retained by officers who locked them in a police
cruiser for one half hour).

While, the passengers were not handcuffed while transported
and were told, as best as could be told by the Spanish speaking
officer on the scene, why they were being taken back to police
headquarters, the facts in this case demonstrate that it is
distinguishable from Taylor.  Unlike in Taylor, the defendants in
this case were transported to police headquarters before they
were formally arrested.  Furthermore, the officers maintained
possession of defendant's identification and his possessions,
including money and the paper work from the van.  It is
questionable whether the explanation given by one of the officers
on the scene about why they were being transported adequately
indicated that the defendant was not under arrest.  The police
behavior in this case was far more coercive than in Taylor.

A reasonable person would have concluded that he was under

arrest when he was transported to police headquarters after (1) his vehicle was surrounded by three police officers approaching in a tactical manner; (2) one of the officers opened the van's door; (3) he and his fellow passengers were removed from the vehicle; (4) during removal, additional officers arrived on the scene; (5) his identification and possessions were taken and held by the police; (6) his vehicle was searched by the police; and (7) he was held on the scene for 45 minutes. On the basis of these factors, a de facto arrest occurred when the passengers were transported to MBTA headquarters. Any statements obtained as a result of interrogation that occurred before <u>Miranda</u> rights were given should be suppressed.

Routine booking questions do not require Miranda warnings. <u>Pennsylvania v. Muniz</u>, 496 U.S. 582, 110 S.Ct. 2638, 2649-2650 (1990); <u>United States v. Reyes</u>, 225 F.3d 71, 76 (1st Cir. 2000). However where questions go beyond those required for booking, or where questions are designed or officer should know they are likely to lead to incriminating response, <u>Miranda</u> warnings must be given. <u>United States v. Reyes</u>, 225 F.3d at 76-77.

In the present case, the law enforcement agents were investigating what they believed was the illegal transportation of aliens by defendants Ramos and Mehia. In doing so they collected their identification, wallets and documents from the van. Among the items seized were large amounts of cash and toll

receipts which showed route of travel.  These items were both significant to the investigation and incriminating.  Prior to asking defendants questions about these items the agents were required to give Miranda warnings.  See United States v. Reyes, 225 F.3d at 76-77.  Statements made to the officers at the MBTA headquarters must be suppressed.

Because defendant Ramos was subject to custodial interrogation at MBTA headquarters, Miranda was required before interrogation could occur.  Recognizing interrogation threatens the Fifth Amendment's guarantee against compelled self-incrimination, the Supreme Court observed in Miranda v. Arizona that, "[u]nless adequate protective devices are employed to dispel the compulsion inherent in custodial surroundings, no statement obtained from the defendant can truly be the product of his free choice."  Miranda v. Arizona, 384 U.S. 436, 458 (1966).  The Court therefore held that whenever "a person has been taken into custody or otherwise deprived of his freedom of action in any significant way" and the authorities interrogate him, any statements elicited will be inadmissible unless they were preceded by the now familiar "Miranda warnings" and a valid waiver of the rights to silence and counsel explained in those warnings.  Miranda, 384 U.S. at 444; See generally, Orozco v. Texas, 394 U.S. 324 (1969) (custodial questioning by four

-37-

officers in bedroom); See also, United States v. Byram, 145 F.3d 405, 409 (1st Cir. 1998).

As in the defacto arrest analysis, whether an individual is in custody is determined by evaluating the totality of the circumstances, including but not limited to, "'whether the suspect was questioned in familiar or at least neutral surroundings, the number of law enforcement officers present at the scene, the degree of physical restraint placed upon the suspect, and the duration and character of the interrogation.'" United States v. Ventura, 85 F.3d 708, 711 (1st Cir. 1996) (quoting, United States v. Masse, 816 F.2d 805, 809 (1st Cir. 1987)). Additionally, a court must evaluate whether, given the totality of the circumstances, a reasonable person in the individual's position would have believed that she was restrained to a degree associated with formal arrest. See, United States v. Trueber, 238 F.3d 79, 93 (1st Cir. 2001).

For purposes of Miranda, "interrogation," includes "either express questioning or its functional equivalent," including, "any words or actions on the part of the police...that the police should know are reasonably likely to elicit an incriminating response from the suspect." Rhode Island v. Innis, 446 U.S. 291, 300-301 (1980). Statements obtained in response to generic questions at booking fall within the "booking exception" to Miranda's warning requirements. United States v. Reyes, 225 F.3d

71, 76 (1st Cir. 2000).  The inquiry as to whether the booking
exception applies is an objective one: "whether the questions and
circumstances were such that the officer should reasonably have
expected the question to elicit and incriminating response." Id.
at 77.  The court has said that in most cases asking an
individual his name, date of birth and social security number
will not violate Miranda.  Reyes at 77.  However, in some
scenarios, even these questions so clearly and directly link the
suspect to the offense that "we would expect a reasonable officer
to foresee that his questions might elicit an incriminating
response."  Id.

In this case, the totality of the circumstances clearly
establish that defendant Ramos was in custody by the time he was
questioned by Agents Davis and Lindstrom at MBTA headquarters.
As stated earlier, 1) Ramos's vehicle had been surrounded by three
police officers approaching in a tactical manner; (2) one of the
officers opened the van's door; (3) he and his fellow passengers
were removed from the vehicle; (4) as they were being removed,
additional officers arrived on the scene; (5) his identification
and possessions were taken and held by the police; (6) his vehicle
was searched by the police; and (7) he was held on the scene for
45 minutes prior to being transported in a cruiser to MBTA
headquarters.  Sometime after 12:30 p.m., over five hours after
the initial encounter with MBTA officers, Ramos was interviewed by

-39-

Agents Davies and Lindstrom.  This occurred after Davies, Lindstrom and Detective Sullivan had conversed and reviewed the passports and documents retrieved from the passengers.  After the interview with defendants, at around 1:30 P.M., Agent Davies contacted Agent Bassett and determined that all the passengers should be transported to the JFK Federal Building for further investigation.

The defendants, who spoke very little English, were interviewed in Spanish by Lindstrom, who spoke very little Spanish.  They were not given their Miranda rights before the interview.  During the interview, Ramos was asked to identify one wallet containing gas and toll receipts and another wallet containing his driver's license and 3600.00 cash.  Davies stated that the amount of money was significant to his investigation.  Here, the questions "were such that the officer reasonably should have expected an incriminating response."  United States v. Reyes, 225 F.3d 71, 77 (1st Cir. 2000).  In the present case the officers were investigating the illegal transportation of aliens, questions about possession of gas and toll receipts showing the route taken in travel, and a large amount of money, consistent with being paid by individuals being transported, were likely to elicit an incriminating response.  See Id. at 77.

   **2.  Defendant Ramos Did Not Understand and Knowingly Waive His Miranda Rights Before Answering Questions at the I.C.E. Office**

The government may not use statements obtained through custodial interrogation of a defendant unless it demonstrates by a preponderance of the evidence that the defendant knowingly, intelligently, and voluntarily waived his right to remain silent and his right to have a lawyer present during questioning. Colorado v. Connelly, 479 U.S. 157, 168 (1986); Miranda v. Arizona, 384 U.S. 436, 444 (1966).  The Supreme Court has characterized this as a "heavy burden."  Miranda, 384 U.S. at 475; see also North Carolina v. Butler, 441 U.S. 369, 373 (1979)("the prosecution's burden is great").  "What is required is a clear showing of intention, intelligently exercised, to relinquish a known and understood right."  United States v Garcia, 983 F.2d 1160, 1169 (1st Cir. 1993).

The requirement of warnings and waiver of rights is fundamental with respect to the Fifth Amendment privilege and not simply a preliminary ritual to existing methods of interrogation. Miranda, 384 U.S. at 476.  Thus it is not sufficient for a law enforcement officer merely to read a person his Miranda rights. Christian, 571 F.2d at 67-68.  Instead, the government has an obligation to assure that the person understands those rights and voluntarily and intelligently relinquishes them.  Moran v. Burbine, 475 U.S. 412, 421 (1986).

It is beyond dispute that defendant Ramos was in custody on May 28, 2004, when he was questioned by federal ICE agents at the

JFK building in Boston.  He had been transported by law enforcement officers from the MBTA parking lot to two different law enforcement agencies.  The van he had been driving was left behind.  He had been held for several hours.  The agents had taken possession of his identification documents including his resident alien card.

It is also beyond dispute that defendant Ramos was interrogated.  According to the federal agents' documentation he was questioned for approximately two hours.  The only issue is whether any waiver of Ramos's rights to remain silent and to have a lawyer present was knowing, intelligent, and voluntary:

> The inquiry has two distinct dimensions. . . . First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception.  Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.  Only if the 'totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived.

Moran v. Burbine, 475 U.S. 412, 421 (1986) (citations omitted), quoted in Colorado v. Spring, 479 U.S. 564, 573 (1987).

In the present case, the government has failed to show a clear intention, intelligently exercised, to relinquish a known and understood right.  The evidence pertaining to the Miranda rights is as follows.

There was no written Spanish Miranda rights form.  The only
written waiver ("waiver form") was a page torn out of a notebook
containing two handwritten, confusing statements in English:  "Dou
understand your rights" and "Do wish to speak with these officers
without your lawyer present."  Neither "question" had a question
mark at the end of it.  These questions, and not the actual
rights, were provided to defendant Ramos because Agent Davies
believed that these were the most important parts of <u>Miranda</u>.
There was no evidence as to whether or not defendant Ramos was
able to read English or whether he read the confusing document
prior to signing it.  If the defendant could read "waiver form",
it is unclear what these sentences conveyed and whether they
confused the defendant about what was being said to him in
Spanish.  Furthermore, the signed document does not contain a
question asking whether he wished to waive his Miranda rights.
Rather it only asks if he Ramos is willing to speak to the
officers without "[his] lawyer" present.  This is particularly
confusing as it implies that Ramos had a lawyer, which he did not.
There was no explanation by Agent Bassett as to why she did not
write out the two questions pertaining to waiver of Miranda in
Spanish.  The "waiver form" containing two confusing questions in
English certainly does not indicate a clear showing of intention,
intelligently exercised, to relinquish a known and understood
right.

Agent Bassett, who conducted the interview with Ramos, described herself as a functional Spanish speaker who was not fluent. As such, she could not understand everything that was stated in Spanish. Nor could she say everything in Spanish. This is borne out in her testimony where she made a very basic grammatical error mistakenly using the verb, "I want"-"quiero" instead of the verb "you want"-"quiere." This mistake, with a simple present tense verb, raises grave concerns about her actual skill and ability to communicate in Spanish with a native Spanish speaker. These concerns are amplified by the fact that she did not, or could not, write out the questions on the "waiver form" in Spanish.

There was no evidence that defendant Ramos had ever been arrested before or had previously heard the Miranda warnings. The evidence was that the rights were given one time orally. As in United States v. Earle, Cr. No. 04-10065-MLW, 2005 WL 5086870, there was no evidence that any effort was made to ascertain whether the defendant actually understood his rights.

There was inconsistent testimony by the agents regarding whether or not Ramos had any questions about the rights. First, on the document signed by Ramos, there is a note that says "Explained in Spanish" next to the statement "Dou understand your rights." (See Exhibit 2). Agent Davies stated that he wrote this because Ramos said something in Spanish indicating he did not

understand rights causing Agent Bassett to explain something about the rights to Ramos in Spanish.  (Tr. 106:16-107:6).  However, Agent Bassett stated that Ramos did not ask a single question and that she did not explain any of the rights to him.  (Tr. 158:1-159:5).

For all of these reasons, the government has not met its heavy burden and shown by a preponderance of the evidence that Defendant Ramos knowingly and intelligently waived his Miranda rights before the custodial interrogation.

## CONCLUSION

For the foregoing reasons, defendant's motion should be allowed.

EDGAR RAMOS
By his attorney,

/s/ Catherine K. Byrne
Catherine K. Byrne
   B.B.O. #543838
Federal Defender Office
408 Atlantic Avenue, 3rd Floor
Boston, MA 02110
Tel: 617-223-8061

## CERTIFICATE OF SERVICE

I, Catherine K, Byrne, hereby certify that this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on April 6, 2007.

/s/ Catherine K. Byrne

Catherine K. Byrne

-45-