UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA )
                         )
            V.           )     CRIMINAL NO. 04-10198-MLW
                         )
EDGAR RAMOS and          )
JOHN MEHIA               )

**GOVERNMENT'S REQUEST FOR FINDINGS OF FACT AND
RULINGS OF LAW, AND SUPPLEMENTAL MEMORANDUM IN
OPPOSITION TO DEFENDANT'S SUPPRESSION MOTION**

In compliance with this Court's order of January 12, 2007, as amended by its orders of February 14 and March 2, 2007, extending the time for filing, the government hereby submits this supplemental memorandum in opposition to: (1) motion of defendant Edgar Ramos ("Ramos") to suppress evidence derived from the stop of the white van by MBTA police officers on May 28, 2004; (2) motion of defendant Ramos to suppress all statements made to law enforcement officers on May 28, 2004; and (3) motion of defendant John Mehia ("Mehia" and collectively with Ramos, the "defendants") to suppress evidence derived from the stop of the white van by MBTA police officers on May 28, 2004.[1]  Herein, the

---

[1]      Although Mehia, as well as Ramos, was twice questioned by ICE agents, he did not file a motion to suppress statements and his counsel specifically represented at the evidentiary suppression hearing that there was no challenge by his client of his waiver of his <u>Miranda</u> rights. [Tr. 151].

government asks this Court to make certain findings of facts and rulings of law.

There is one preliminary matter the government will initially address: the issues the government considers framed by the record before this Court.  As the Court knows, and as recounted in greater detail below, MBTA Inspector Patricia Pitts noticed a white van (the "van") in the parking lot of the Sullivan Square Subway/Bus Station just before 7:00am on May 28, 2004, reported her suspicions about 20 minutes later to her dispatcher, who contacted MBTA police, who responded and investigated.  Ramos was the driver of the van; Mehia was the front seat passenger; and five Brazilian nationals were in the back of the van.  After removing all occupants, including the defendants, from the van, the MBTA police officers reviewed the passports of the back seat passengers, took note of the absence of any entry stamps into the United States, and transported the occupants to their headquarters in South Boston in order to involve immigration officials.  Special Agents from Immigration and Customs Enforcement ("ICE") responded to MBTA police headquarters, reviewed the identification documents obtained from the defendants and the five Brazilian nationals, briefly questioned Ramos and Mehia, and transported all seven to ICE offices at the JFK Building in downtown Boston.  At ICE offices, the five Brazilian nationals were processed for removal, and the

defendants were interviewed and then placed under arrest for transporting illegal aliens within the United States, in violation of 8 U.S.C. §1324(a)(1)(A)(ii).

The government will address the following major issues:

1)    Whether the articulable suspicion standard of <u>Terry v. Ohio</u>, 392 U.S. 1 (1968) was satisfied, so that the MBTA officers were justified in "stopping" the van and removing the occupants.[2]

2)    Whether Officer O'Hara was justified in opening van doors and directing the occupants of the van to exit the vehicle.

3)    Whether and when probable cause existed to believe that the defendants had transported illegal aliens within the United States, in violation of 8 U.S.C. §1324(a)(1)(A)(ii).

4)    Whether the "booking" type questioning of Ramos was permissible despite the absence of <u>Miranda</u> warnings.

---

[2]    As the Court will note, and as invited by the Court at the conclusion of the suppression hearing, the issues framed herein differ somewhat from those argued by the government at the hearing. In particular, the government is not seeking to justify the interactions between the MBTA officers and the defendants as a permissible consensual encounter. <i>See</i> <u>United States v. Mendenhall</u>, 446 U.S. 544, 552 (1980).

    5)    Whether Ramos voluntarily waived his <u>Miranda</u> rights prior to being interviewed at ICE offices.

## I.   <u>REQUESTED FINDINGS OF FACT</u>[3]

1.    Shortly before 7:00 am, Friday, May 28, 2004, MBTA Inspector Patricia Pitts ("Pitts") arrived at work at the Sullivan Square Subway/Bus Station. [Tr. 29]. May 28th was the Friday before the three-day Memorial Day weekend.

2.    As Pitts was driving down the ramp from Route 93, she could see the Sullivan Square Station and its public parking area in the front of the station. She immediately noticed a large white van. It stood out to her, and got her immediate and continued attention. [Tr. 29].

3.    After arriving at her inspector's booth inside the station to commence work, she still noticed the van and noted that it had at least two occupants, a driver and a front seat passenger. [Tr. 30].

4.    After noticing the van, Pitts paid close attention to it because she had one day earlier attended a special terrorism

---

[3]    This is not a case involving significant factual disputes. Rather, this is a case in which the parties view the facts and the law differently. Although defendants probed a number of points on cross-examination of government witnesses, they merely clarified the witnesses' testimony, and did not create factual disputes of any significance. Because neither defendant testified, there are no "credibility contests" for this Court to decide.

class for MBTA employees that taught employees to observe things at work that were different from the ordinary. [Tr. 31, 32-33].

5.    She took a bus going to that area of the station, got off, and walked directly by the van. [Tr. 31-32]. The van had tinted windows [Tr. 40], and in addition to the front seat occupants, she noticed that there were several additional people in the back of the van, perhaps more than five. [Tr. 31-32, 40]. She also noticed that there was a paper license plate fastened over a regular license plate, which was one of the things that her terrorism class had discussed. [Tr. 32-33]. As far as she could tell, all occupants of the van were male, and she saw the front seat occupants, who she thought from the color of their skin might be of Middle Eastern descent [Tr. 34, 57], get out of the van, discuss something together, and observed one of them write something on a piece of paper, which was also something she had been taught the previous day to be watchful for, and then get back in the van. [Tr. 34-35]. She looked at other vehicles near the van, other vehicles in the same parking lot, and none of them had people just sitting in the vehicle. [Tr. 49-50]. The van was parked where people leave cars to take the trains and buses that depart the station. The van was not parked where vehicles pick up or drop off commuters. She was not used to seeing people just sitting in a vehicle in that area for a period of time. [Tr. 31].

6.    After she walked by the van and made her observations, Pitts called her dispatcher and relayed her observations.  [Tr. 33].  She had observed the van for about 20 minutes or so before calling. [Tr. 35].

7.    MBTA Patrolman Steven O'Hara ("O'Hara") had been a patrolman for the MBTA of seven and one-half years, and was dispatched with his partner (Officer Silen) to the Sullivan Square Station on the morning of May 28, 2004. [Tr. 61].  He was told by the dispatcher that an MBTA employee had called in a suspicious vehicle.  The employee had observed several males exiting in and out of a white van for approximately one half hour. [Tr. 62].  The dispatcher also told the officers the occupants of the van were Middle Eastern men. [Tr. 81].

8.    O'Hara observed the van from the exit ramp as he pulled off Route 93 and entered the parking lot for the station.  The officers pulled their cruiser behind the van at an angle so they could see both sides of the van. [Tr. 63-64].  They were the first officers to respond.  They exited the cruiser and approached the van in a somewhat tactical form because they had been told they had a suspicious vehicle containing several individuals, and the van had tinted windows in the back and on the sides (up to the front seat windows). [Tr. 64-67].  O'Hara, who had also had the same MBTA terrorism training that Pitts had

6

undergone [Tr. 80], also saw that there was a temporary paper plate over a regular Texas license plate. [Tr. 71, 80].

9.    While O'Hara and his partner exited their cruiser, another MBTA officer, Officer Federico arrived and approached the van on the driver's side [Tr. 65], while O'Hara approached the passenger side front door.  As O'Hara approached the front passenger side window, he saw some type of movement in the back of the van.  Through the tinted windows he could see shawdows, not clear images, of some heads in the back of the van, which seemed to have several seats. [Tr. 66, 70, 75].

10.    As Officer Federico reached the front driver's side window, he had some communication with the driver.  At the same time, O'Hara opened the passenger side front door because of safety concerns.  He knew there were multiple people in the van and he could not see the front seat passenger's hands. [Tr. 68].  After opening the door, he asked the front seat passenger what they were doing there, received no response, and asked the front seat passenger out of the van. [Tr. 70].  After both front seat occupants were out of the van, O'Hara asked everyone else to get out of the van, one at a time (for safety reasons). [Tr.71, 72].

11.    After the occupants were out of the van, the driver, Ramos, provided O'Hara with his driver's license and a travel agency document. [Tr. 73, 75; Ex. 1].  The back seat passengers,

7

in response to a request for identification, provided foreign passports (either Brazilian or Portugese) that contained no entry stamps. [Tr. 73, 76]. Van occupants were then transported to MBTA police headquarters in order to get immigration officials involved. O'Hara transported two or three of the van occupants in his cruiser without the use of handcuffs. [Tr. 76-79]. Prior to transport, Officer O'Hara and his partner "looked through" the van and found no luggage. [Tr. 77].

12. There is no evidence that guns were drawn by any MBTA officer during the approach to the van and the interaction with its occupants.

13. Special Agent Richard Davies ("Davies") of Immigration and Customs Enforcement ("ICE") was directed by his supervisor to respond to the MBTA police headquarters on the morning of May 28, 2004. [Tr. 84]. At that time he had been a Special Agent with ICE (and its predecessor agency, INS) for over six and one-half years and was currently assigned to the Human Smuggling and Trafficking Unit. [Tr. 84]. He was told by his supervisor that the MBTA police had a van of alleged illegal aliens at its headquarters and that he and a fellow agent should report to that location. [Tr. 84].

14. When Davies arrived at MBTA police headquarters he interacted with Detective Sullivan of the MBTA police, who showed

8

Davies the documents obtained from the occupants of the van. [Tr. 85]. One of the drivers had a California birth certificate and a Texas driver's license (Mehia), and the other had a resident alien card and social security account number card (Ramos). [Tr. 85]. The other five occupants each had a Brazilian passport. All passports showed entries into Mexico, but did not show stamps indicating lawful entry into the United States. Also, the passports did not have attached I-94 cards, for entry through an American airport, or visas. [Tr. 85-87]. Davies concluded that the passport holders had not made legal entries into the United States. [Tr. 89].

15.    Davies' partner, Special Agent Linstrom, talked to Ramos and Mehia, with Davies present. Lindstrom asked Ramos his name, whether he had any medical problems, whether a particular wallet that had been taken from the drivers was his, and whether he was a United States citizen, and whether "this" was is green card.[4] [Tr. 90-91, 122]. <u>Miranda</u> warnings did not precede this limited questioning. [Tr. 110-111].

16.    After determining that the five Brazilians were illegal aliens, and that Ramos and Mehia were legally present in the

---

[4]
    Mehia was similarly questioned, but has not moved to suppress his statements.

9

United States, arrangements were made to transport all seven men to ICE offices in Boston, the Brazilians because they were illegally in this country and needed to be processed for removal, and the drivers because they had appeared to have violated federal law by transporting illegal aliens across the country. [Tr. 89-90]. Ramos and Mehia were handcuffed for transportation to ICE offices and transported by Davies and Lindstrom at about 1:30 pm. Other ICE officers transported the five Brazilians to ICE offices. [Tr. 92-93, 123].

17. At ICE offices, Davies' supervisor, Special Agent Cheryl Bassett ("Bassett"), and Davies interviewed Ramos while the five Brazilians were being processed administratively for deportation. [Tr. 94-95]. Bassett had been with ICE/INS for ten years, the last four as a supervisor. [Tr. 135-136]. She can read Spanish and is a functional Spanish speaker who is able to speak and be understood in that language. [Tr. 137, 142].

18. Bassett's interview of Ramos, with Davies present, began at about 3:40 pm that day. [Tr. 140]. Bassett first introduced herself and Agent Davies to Ramos and explained they were conducting an investigation into, and wanted to talk to him about, whether or not he had transported illegal aliens across the United States. [Tr. 140-141]. Bassett and Davies could not find a Miranda waiver form containing the Miranda rights and

10

signature lines, but Bassett had on her person her <u>Miranda</u> rights card, which contained the standard <u>Miranda</u> questions in both English and Spanish. [Tr.141; Ex. 5]. Bassett read Ramos his <u>Miranda</u> rights from her card in Spanish, and asked, in Spanish, if he understood them, to which Ramos replied affirmatively. [Tr. 142]. Ramos then signed his name to a handwritten form prepared by Davies that memorialized his understanding of his <u>Miranda</u> rights. [Tr. 108, Ex. 3, 142]. Bassett then asked Ramos, in Spanish, if he was willing to answer questions at that time, to which Ramos answered affirmatively, and again signed the handwritten form memorializing his willingness to precede with the interview. [Tr. 142-143]. Bassett was the primary questioner during the interview that followed, which was conducted mostly in Spanish. [Tr. 144].

19. Ramos and Mehia did not testify at the evidentiary hearing.[5]

---

[5]
Both Ramos and Mehia filed affidavits in support of their suppression motions. However, neither defendant took the stand so that their affidavit assertions could be subject to cross-examination. Accordingly, the government asks this Court, by motion submitted herewith, to strike and disregard in their entirety the affidavit assertions of the defendants. *See* <u>United States v. Baskin</u>, 424 F.3d 1, 3 (1st Cir. 2005) (district court acted within its discretion in striking defendant's affidavit submitted in support of suppression motion when defendant invoked his Fifth Amendment right against self-incrimination and refused to answer prosecutor's cross-examination questions).

## II.  <u>REQUESTED RULINGS OF LAW AND REASONS IN SUPPORT THEREOF</u>

Essentially, the government asks this Court, based on the above requested findings of fact, and for reasons explained in detail below, to rule as follows:

1)  MBTA Officer O'Hara was justified, under the articulable suspicion standard of <u>Terry v. Ohio</u>, 392 U.S. 1 (1968), in conducting a <u>Terry</u> investigative "stop" of the white van in the Sullivan Square Station parking lot on the morning of May 28, 2004.

2)  MBTA Officer O'Hara was justified in opening van doors and directing the occupants of the white van to exit the vehicle and provide identification documents. <u>Pennsylvania v. Mimms</u>, 434 U.S. 106, 108-09 (1977) (*per curiam*) (officers may require driver of stopped vehicle to step out of vehicle); <u>Maryland v. Wilson</u>, 519 U.S. 408 (1997) (officers can require passengers of stopped vehicle to step out of vehicle).

3)  Upon Officer O'Hara's observation of the Texas license plate on the white van, his review of the foreign passports which did not contain visas or entry stamps indicating lawful entry into the United States, and the Oxford Tours passenger list of individuals with Latino names who were being transported from Dallas, Texas, to

various locations in the Northeast United States, probable cause existed to believe that: (1) the five back seat passengers had entered the United States illegally, in violation 8 U.S.C. §1325(a); and (2) illegal aliens were being knowingly transported by the defendants within the United States, in violation of 8 U.S.C. §1324(a)(1)(A)(ii).

4)   Some of limited questioning of Ramos by Agent Lindstrom at the MBTA police headquarters falls within the routine booking questions exception to the requirements that <u>Miranda</u> warnings and a waiver precede any custodial interrogation. <u>Pennsylvania v. Muniz</u>, 496 U.S. 582, 600-602 (1990); <u>United States v. Reyes</u>, 225 F.3d 71, 76-77 (1st Cir. 2000). However, this portion of Ramos' motion is moot based upon the government's representation that it will not offer at trial any of the statements Ramos made to the ICE officers at the MBTA police headquarters.

5)   Ramos's oral and written waiver of his <u>Miranda</u> rights preceding his interview at ICE offices by Agent Bassett was voluntary. <u>Colorado v. Connelly</u>, 479 U.S. 157, 170 (1986) ("<u>Miranda</u> protects defendants against government

coercion leading them to surrender rights protected by the Fifth Amendment; it goes no further than that.").

A.  **Terry Stop Issue**

In Terry, 392 U.S. at 22, the Supreme Court recognized that "a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to effect an arrest."  In determining whether a particular investigatory seizure or search violates the Fourth Amendment's protection against unreasonable searches or seizures, the inquiry is the now familiar two-prong test announced in Terry -- "whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place."  Terry, 392 U.S. at 19-20; *see also* United States v. Sharpe, 470 U.S. 675, 682 (1985); United States v. Stanley, 915 F.2d 54, 55 (1st Cir. 1990); United States v. Trullo, 809 F.2d 108, 111 (1st Cir. 1987).

The Supreme Court in Terry recognized: "[T]here is 'no ready test for determining reasonableness other than by balancing the need to search [or seize] against the invasion which the search [or seize] entails.'" Terry, 392 U.S. at 21 (*quoting* Camara v Municipal Court, 387 U.S. 523, 534-535, 536-537 (1967).  *See also*

14

United States v. Brignoni-Prince, 422 U.S. 873, 878 (1975) (reasonableness depends "on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers").  To assess the need to search, the Supreme Court established the "articulable suspicion" standard against which officers' conduct must be measured: "[I]n justifying the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." Terry, 392 U.S. at 21.

The articulable suspicion standard is not a stringent one. "The Fourth Amendment requires 'some *minimal level* of objective justification' for making the stop."  United States v. Sokolow, 490 U.S. 1, 7 (1989) (*quoting* INS v. Delgado, 466 U.S. 210, 217 (1984) (*emphasis added*)).  As stated by the United States Supreme Court:

> That level of suspicion is considerably less than proof of wrongdoing by a preponderance of the evidence.  We have held that probable cause means "a fair probability that contraband or evidence of a crime will be found," Illinois v. Gates, 462 U.S. 213, 238 (1983), and the level of suspicion required for a Terry stop is obviously less demanding than that for probable cause, *see* United States v. Montoya de Hernandez, 473 U.S. 531, 541, 544 (1985).

15

<u>Sokolow</u>, 490 U.S. at 7; *see also* <u>United States v. Jackson</u>, 918 F.2d 236, 239 (1ˢᵗ Cir. 1990); <u>Alabama v. White</u>, 496 U.S. 325, 330 (1990) ("Reasonable suspicion can arise from information that is less reliable than that required to show probable cause.").

The officers' conduct must be viewed in the context of the circumstances as a whole. <u>United States v. Cortez</u>, 449 U.S. 411, 417 (1981) ("the totality of the circumstances -- the whole picture -- must be taken into account"). "The circumstances 'are not to be dissected and viewed singly; rather they must be considered as a whole.'" <u>Stanley</u>, 915 F.2d at 55 (*quoting* <u>Trullo</u>, 809 F.2d at 111); *see also* <u>United States v. Walker</u>, 924 F.2d 1, 3 (1st Cir. 1991) (court must view the circumstances relating to the stop and frisk as a whole). "The circumstances under which the officers acted 'are to be viewed through the eyes of a reasonable and cautious police officer on the scene, guided by his experience and training.'" <u>Trullo</u>, 809 F.2d at 112 (*quoting* <u>United States v. Hall</u>, 525 F.2d 857, 859 (D.C. Cir. 1976)). That is, the assessment of officers' conduct must be judged against an objective standard. <u>Terry</u>, 392 U.S. at 21; *see also* <u>United States v. Hensley</u>, 469 U.S. 221, 232-233 (1985). *See also* <u>Whren v. United States</u>, 517 U.S. 806, 813 (1996) (quoting <u>Scott v. United States</u>, 436 U.S. 128, 136 (1978) ("[T]he fact that the officer does not have the state of mind which is

16

hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action.")).

Here, the "not stringent" Terry standard is easily met.6 A reasonable and cautious police officer on the scene at Sullivan Square Station on the morning of May 28, 2004, guided by his experience and training, would have been aware of the following facts.7 Ground transportation facilities such as train, subway,

---

6
The government is not asking this Court to find that Officer O'Hara's opening of the van doors and his instructions to the occupants of the van to exit the vehicle was permissible absent a justifiable investigative/Terry stop, which the government argues herein is supported by the record before this Court. At the same time, the government is arguing that the officer's conduct was justified under the first "step" of Terry, and that the Court need not move onto the second "step" of Terry (articulable suspicion that the individuals are armed and dangerous) to conclude that Officer O'Hara permissibly opened the van doors and directed the occupants to exit the vehicle.

7
The government does not rely on the "collective knowledge" rule in listing the facts of which a reasonable officer in Officer O'Hara's position would have been aware at the time the van was initially approached. The government does not believe that the doctrine would reach so far as to impute to Officer O'Hara the facts observed, but not conveyed, by Pitts. Rather, the facts relied on herein are those that Officer O'Hara testified that he was specifically aware of, plus those facts which a reasonable and experienced MBTA police officer would have known or observed on his own, such as the location of the van in the part of the station for parking, as opposed to the part for discharging and picking up riders, and the absence of other occupied vehicles in the parking lot where the van was parked that morning.

17

and bus stations were considered a likely target for terrorism
acts after September 11, 2001 and the then-recent March 11, 2004
Madrid train bombings that killed 191 persons.  All 19 of the
9/11 airplane hi-jackers were men of Middle Eastern descent.[8]  An
MBTA employee had called the MBTA police about a van containing
several individuals parked in the Sullivan Square parking lot and
thought to be suspicious.  The van had been parked in that
location for approximately 30 minutes.  Several males had been
observed getting out of and back into the van while it remained
parked in the parking lot, and were described as appearing to be
of Middle Eastern descent.[9]  The van was parked in the part of

---

[8]
     The events of 9/11 and the much more recent Madrid train
bombings, and the attractiveness of transportation facilities as
terrorism targets are all facts that should be found by this Court
to be within the knowledge of a reasonable and experienced law
enforcement officer working for a large metropolitan transportation
system on May 28, 2004.

[9]
     "To establish reasonable suspicion, an officer cannot rely
solely on generalizations that, if accepted, would cast suspicion
on large segments of the lawabiding population." United States v.
Manzo-Jurado, 457 F.3d 928, 935 (9th Cir. 2006).  However, that is
not what happened in this case, where the reported ethnicity of the
defendants was only one of many articulable facts supporting the
Terry stop of the van.  The Supreme Court has recognized that
Hispanic ethnicity can be a relevant factor in a reasonable
suspicion inquiry in a border area, but it cannot by itself justify
an investigatory stop. United States v. Brignoni-Ponce, 422 U.S.
873, 886-87 (1975).  Here, the government is asking this Court to
accept the reported Middle Eastern descent of the occupants of the
van as only one (and not a crucial one at that) of a number
articulable facts prompting and warranting further police
investigation.

18

the parking lot where commuters parked their cars before taking a subway or bus from Sullivan Square.  The van was not parked in the designated area for dropping off and picking up passengers. Other vehicles in the parking lot where the van was parked did not have occupants.  The back and side windows (up to the front seat windows) of the van were tinted.10  The front seat of the van contained two occupants. Multiple occupants and movement was visible in the rear of the van, but only as "shadows" through the tinted windows.  The van had a temporary Texas license plate attached over what appeared to be a regular Texas license plate. Most persons using a subway and bus station in Somerville would be expected to be local residents, or at least from states

_____

10    The government is relying on the tinted windows in support of the first step of Terry, in considering whether the stop/seizure of the van was justified.  That is, we are not arguing (although we could) that the tinted windows provided articulable suspicion to warrant the officers to believe that their safety was at risk. Rather, the tinted windows disguised both the number of individuals in the van and their character, and is one more factor, in combination with other factors, supporting the justification for the additional, measured investigation undertaken by the officers. Certainly, the obstruction caused by the tinted windows is something that persons engaged in or about to be engaged in criminal activity might purposely use in order to hide their actions from public view and gain an element of surprise. See United States v. Hensley, 469 U.S. 221, 227 (1985) (quoting United States v. Place, 462 U.S. 696, 702 (1983) (police have authority "to stop a person 'when the officer has reasonable, articulable suspicion that the person has been, is, or is about to be engaged in criminal activity.'")).

19

adjacent to Massachusetts, so that Texas license plates would not be common. *See* <u>Terry</u>, 392 U.S. at 21 (permitting rational inferences from articulable facts).

Officer O'Hara and his partner were confronted with an articulable and suspicious situation. The public interest would hardly have been served by their failure to approach the van and ask for license and registration information, obtain more information, and assess the suspicious situation from a better vantage point. As the Supreme Court has stated, endorsing conduct similar to that taken by Officer O'Hara and his fellow officers: "A brief stop of a suspicious individual in order to determine his identity or to maintain the status quo momentarily while obtaining more information may be most reasonable in light of the facts known to the officer at the time." <u>Adams v.</u> <u>Williams</u>, 407 U.S. 143, 146 (1972). Would any court question the permissibility of an investigative stop if similar facts had been known to police officers outside the Murrah Federal Building in Oklahoma City on April 19, 1995? The van in this case, unlike the rental truck in Oklahoma City, did not actually present a terrorism threat, but that could not be known to Officer O'Hara without further investigation, and the officers actions can only be evaluated by the facts available and known (and rational inference therefrom) before the stop, as opposed to what the

20

facts turned out to be.  The horrors of 9/11 and the Madrid train bombings less than three months earlier were still fresh in the minds of cautious and experienced police officers and should be considered by this Court is assessing the reasonableness of the officer's actions in this case, which were predicated on an articulable suspicion of a possible threat of terrorism.

Certainly the facts that existed compelled a reasonably cautious and experience officer to investigate further. What Officer O'Hara and his partner did on May 28, 2004 at Sullivan Square was what the Supreme Court in _Terry_ sanctioned as a reasonable intrusion on individual rights.  The MBTA officers were confronted with an articulable factual situation that warranted, if not required, further investigation.  Their response properly balanced the competing need to investigate against the invasion which the stop of the van entailed.  _See_ _Terry_, 392 U.S. at 21.  The officers approached the van in a professional and balanced manner; although approaching carefully, they did not draw their weapons at any time.  They did not drag occupants out of the van, but allowed them to exit individually under their own power.  Once the occupants were out of the van and the officers knew they were investigating illegal aliens and not a terrorism threat, they did not engage in safety-pat frisks, and did not place anyone under arrest or handcuff any of the

occupants of the van while at the station or en route to police headquarters. Thus, their conduct was reasonably related in scope to the circumstances which justified the interference in the first place, properly adjusted as more facts became known. *See* <u>Terry</u>, 392 U.S. at 19-20.

**B.    Mimms/Wilson Issue**

Upon a finding that Officer O'Hara and his fellow officers were justified under <u>Terry</u> to conduct an investigative stop of the van, his decision to remove the occupants from the van is a firmly established adjunct to a permissible <u>Terry</u> stop of a vehicle, even without articulable concern for his or his fellow officers' safety.11  In <u>Mimms</u>, 434 U.S. at 111, the Supreme Court held that a driver of a lawfully stopped motor vehicle could be removed from the vehicle even without specific and articulable concerns for the safety of the police officers.  In conducting the balancing required under <u>Terry</u>, the <u>Mimms</u> Court considered the safety of the officer to be both legitimate and weighty, even in the absence of unusual or suspicious behavior by the driver,

---

11
    Consistent with general practice, the government uses the term "<u>Terry</u> stop" in a general sense.  It could more precisely be called a "<u>Terry</u> seizure."  Thus, the fact that the van was not moving before it was approached by MBTA officers is irrelevant.  The van was still "stopped" in the sense that the officers conducted a seizure of the vehicle in connection with conducting further police investigation.

22

and found the additional intrusion on the drive to be *de minimis.*
Mimms, 434 U.S. at 110-111.   In Wilson, 519 U.S. at 415, the
Supreme Court extended the holding of Mimms to passengers of a
legitimately stopped vehicle based on general, as opposed, to
specific concerns of officer safety.

Here, it easily follows that if Officer O'Hara could
legitimately order the occupants of the van to exit the vehicle,
he could open the door or doors of the van as part of that
direction.12   As the Fourth Circuit stated in United States v.
Stanfield, 109 F.3d 976, 983 (4th Cir. 1997): "[T]he actual
invasion of privacy entailed in a officer's opening of the
vehicle door is indistinguishable from, if not precisely the
same, as that which occurs when an occupant is required to open a
door to exit a vehicle pursuant to an order given under the
authority of Mimms or Wilson."   In Stanfield, the court
ultimately announced a bright-line rule that permits officers of
a stopped vehicle with tinted windows preventing the vehicle's
interior to be visible, to open a  door and inspect the interior
based on the specific danger posed by tinted windows.   Id. at
984.  In so doing the Court stated:

---

12
     It is also irrelevant that Officer O'Hara had subjective
safety concerns that prompted him to open the front passenger door
of the van.  The only question is whether a cautious and experience
officer would have been warranted in taking that action.

23

> [W]e believe that the [Supreme] Court's decisions in
> Mimms and Wilson in particular would support a holding
> that whenever, during a lawful traffic stop, officers
> are required to approach a vehicle with windows so
> heavily tinted that they are unable to view the
> interior of the stopped vehicle, they may, when it
> appears in their experienced judgment prudent to do so,
> open at least one of the vehicle's doors and without
> crossing the plane of the vehicle, visually inspect its
> interior in order to ascertain whether the driver is
> armed, whether he has access to weapons, or whether
> there are other occupants of the vehicle who might pose
> a danger to the officers.

Id. at 981. Here, where the van's tinted windows permitted

Officer O'Hara to see nothing more than the "shadows" of heads in

the rear of the van, the Stanfield bright-line rule is

applicable. However, in the government's view, Mimms and Wilson

provide the same bright-line rule, whether or not the visibility

of a vehicle's interior is impaired by tinted windows, and

whether or not specific articulable safety concerns are present.

### C. **Probable Cause Issue**

Probable cause to support an arrest "exists where 'the facts

and circumstance within their [the arresting officer's] knowledge

and of which they had reasonable trustworthy information [are]

sufficient in themselves to warrant a man of reasonable caution

in the belief that' an offense has been or is being committed."

Draper v. United States, 358 U.S. 307, 313 (1959) (quoting

Carroll v. United States, 267 U.S. 132, 162 (1925)). See also

United States v. Feliz, 182 F.3d 82, 86 (1st Cir. 1999) ("The

24

probable cause standard 'does not demand showing that such a belief be correct or more likely true than false.'"). "In dealing with probable cause, . . . as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." Brinegar v. United States, 338 U.S. 160, 175 (1949). *See also* Illinois v. Gates, 462 U.S. 213, 231 (1983) (*quoting* Brinegar v. United States, 338 U.S. 160, 176 (1949) ("Perhaps the central teaching of our decisions bearing on the probable cause standard is that it is a 'practical, nontechnical conception.'")).

Although the government considers the transport of the defendants and the five Brazilians from Sullivan Square to MBTA police headquarters to be a permissible adjunct to a lawful Terry stop, probable cause to justify an arrest, and thereby justify that same transportation, also existed.13 Here, as with the

---

13

The defendants were certainly in custody when they were transported to MBTA headquarters. But, a Terry stop permits a limited period of custody. The whole point of Terry is that an officer can require an individual, where the Terry standard is met, to submit to governmental authority for purposes of investigative inquiries. A strong argument exists to support the transport of the van occupants to MBTA headquarters in order to involve ICE officials as continuation of a reasonable Terry stop. However, it is not necessary for this Court to decide that issue because the continued custody of the defendants is supported by probable cause sufficient to support their arrest. Again, whether the MBTA officers believed that the occupants of the van were under arrest

Terry stop analysis, the subjective thoughts and intentions of the MBTA officers are not controlling, as the probable cause standard is an objective one. Berkemer v. McCarty, 468 U.S. 420, 442 (1984) ("A policeman's unarticulated plan has no bearing on the question whether a suspect was 'in custody' at a particular time."); United States v. Trueber, 238 F.3d 79, 92 (1st Cir. 2001) ("The subjective intent of the agents is not relevant to either part of the inquiry: it does not impact the validity of the initial investigative stop, and it has no bearing on determining whether police conduct transformed an investigative stop into a *de facto* arrest.").

Here, when Officer O'Hara and his fellow officers decided to transport the occupants of the van to MBTA police headquarters so that immigration officials could be involved, the following facts were available for a reasonable and experienced law enforcement officer.

An extended passenger van had been parked in a public parking lot used by commuters who park their vehicles and then take subways or buses. The van was the only vehicle in the lot with occupants, suggesting that it was waiting for someone or

---

is irrelevant, as the standard for determining the existence of probable cause, as is the case with articulable suspicion under Terry, is an objective one.

some others to arrive.  The van had a Texas temporary license plate attached over a regular Texas license plate.  The drivers appeared to be of Hispanic descent, although legally present in the United States, and to be out-of-state residents.  The driver was in possession of an official looking passenger list for "Oxford Tours," of Dallas, Texas, a large city in a state contiguous with, and having an extensive border with Mexico that is generally and widely known as a prime route for undocumented aliens to enter this country.  The Oxford Tours document listed 13 person with Latino names and "destinos" along the East Coast of the United States, from New Jersey to Massachusetts.  Seven of the names had "destinos" of Somerville, where the van was parked, while only five individuals were present in the back seats of the van.  All five of the back seat passengers possessed Brazilian passports.  Each passport had an entry stamp into Mexico, but no exit stamps from Mexico or entry stamps into the United States.

None of the back seat passengers had luggage.[14]

_____

[14]
        Officer O'Hara testified that after looking through the passports he and his partner looked through the van and found no luggage. [Tr. 77].  Considering Officer O'Hara's "look through the van" to be a search, it is a permissible probable cause search pursuant to the automobile exception to the warrant requirement. United States v. Ross, 456 U.S. 798, 804-09 (1982).  The same probable cause argued herein to support the continued detention of the occupants of the van and their transport to MBTA police

The objective facts implicate at least two criminal immigration statutes. First, Title 8, United States Code, Section 1325(a) provides criminal punishment for "[a]ny alien who (1) enters or attempts to enter the United States at any time or place other than as designated by immigration officers, or (2) eludes examination or inspection by immigration officers . . . ." Second, Title 8, United States Code, Section 1324(a)(1)(A)(ii) provides criminal penalties for any person who "knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, transports, or moves or attempts to transport or move such alien within the United States by means of transportation or otherwise, in furtherance of such violation of law."

The facts available to Officer O'Hara (and rational inferences therefrom) before transportation of the occupants of the van to MBTA police headquarters easily establish probable cause to believe that the five Brazilians in the back of the van were aliens who did not enter this country lawfully, and thus, had violated 8 U.S.C. §1325(a). They all had Brazilian passports that showed entry into Mexico, but contained no evidence of exits from Mexico or entries into the United States. The Oxford Tours

---

headquarters supports a warrantless search of the van and the officers' knowledge that the Brazilians had no luggage.

28

passenger list showed transportation from Texas, which has a long and porous border with Mexico, to several locations in the Eastern United States before reaching Somerville. Despite the length of travel from their native Brazil (or even from Dallas), none of the back seat passengers had luggage. Those facts would warrant a reasonable and experienced law enforcement officer to believe that the Brazilians had entered this country illegally without inspection by immigration officers, in violation of federal criminal law.

Given probable cause to believe that the five Brazilians were in the United States in violation of federal law, and the fact that Ramos and Mehia were drivers of the van,[15] probable cause exists to believe that Ramos and Mehia violated 8 U.S.C. §1324(a)(1)(A)(ii) if there existed probable cause to believe that Ramos and Mehia either knew or had acted in reckless disregard of the fact that the Brazilians were illegally present in this country. Ramos and Mehia had just driven five Brazilians from Texas, a state with a long border with Mexico and a

---

[15]    The testimony at the suppression hearing was less than clear in identifying Ramos as the driver and Mehia as his co-driver and front seat passenger. However, those facts were accepted by all parties at the suppression hearing. Additionally, the Oxford Tours passenger list can reasonably be read to identify "Edgar" (Ramos's first name) as the driver and "John Mehia" as the two drivers.

generally understood history of undocumented border crossings, to Somerville, MA, and none of the passengers had any luggage. Accordingly, there exists, at a minimum, probable cause to believe that the defendants transported illegal aliens in reckless disregard of the illegal status of the five Brazilians, in violation of federal criminal law.16

D.    **Booking Questions Exception to Miranda Issue**

At the MBTA police headquarters, after the decision was made to transport Ramos and Mehia to ICE offices, Agent Lindstrom asked Ramos the following questions: (1) what is your name; (2) do you have any medical conditions I should know about; (3) is this your personal property; (4) are you a citizen of the United States; and (5) is this your green card.    No _Miranda_ warnings

---

16     Probable cause to arrest sufficient to justify continued custody after a permissible _Terry_ stop differs from actually placing someone under arrest, which did not happen to the defendants until after each was interviewed by Agent Bassett.    The government is not required to arrest an individual merely upon obtaining probable cause to support an arrest. _See_ United States v. Lovasco, 432 U.S. 783, 791 (1977) ("prosecutors are under no duty to file charges as soon as probable cause exists but before they are satisfied they will be able to establish the suspect's guilt beyond a reasonable doubt.").    The government must not only have probable cause to arrest, it must be content that it has sufficient evidence to sustain a conviction under a beyond a reasonable doubt standard of proof.    That is why the general practice in this district is that agents do not effect non-exigent criminal arrests without consultation with an Assistant U.S. Attorney, which is the practice that was followed in this case.

were given to Ramos before the questions.  The government also concedes that Ramos was in custody at that time.

However, the questions and answers given violate Miranda and must be suppressed only if they do not fall within the "well established line of case authority [that] has created an exception to the Miranda rule for 'routine booking interrogation," involving questions, for example, about a suspect's name, address, and related matters." United States v. Doe, 878 F.2d 1546, 1551 (1st Cir. 1989).  Clearly, asking the defendants their names does not violate Miranda, nor does the question about medical conditions.  *See* United States v. Bishop, 66 F.3d 569, 572 (3rd Cir. 1995) (police officer's question about defendant's limp was part of booking procedure designed to fulfill the government's obligation to provide medical attention if necessary).  The remaining three questions are closer calls.

However, the government is not asking this Court to determine if the questioning at MBTA police headquarters was the equivalent of "routine booking" questions, or whether the particular questions were designed to elicit incriminating responses.  The government will not offer at trial the questions posed by Agent Lindstrom, or the answers of Ramos.  The government will however, offer the defendants' wallets and contents at trial by authentication means that existed prior to

and independent from Ramos' admissions to Agent Lindstrom.  At least to date, and separate and apart from their attack on the stop of the van, Ramos and Mehia have not sought to suppress the wallets, nor did they develop facts at the suppression hearing necessary to address that issue.

**E.    Miranda Issue**

In Miranda v. Arizona, 384 U.S. 436 (1966), "the Court concluded that in the context of 'custodial interrogation' certain procedural safeguards are necessary to protect a defendant's Fifth and Fourteenth Amendment privilege against self-incrimination.  More specifically, "the Court held that 'the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self incrimination.'" Rhode Island v. Innis, 446 U.S. 291, 297 (1980) (quoting Miranda, 384 U.S. at 444).  A defendant like Ramos who has been advised of his rights can "waive effectuation of these rights, provided the waiver is made voluntarily, knowingly, and intelligently." Miranda, 384 U.S. at 444; Connelly, 479 U.S. at 169 ("Of course, a waiver must at a minimum be 'voluntary' to be effective against an accused."); United States v. Palmer, 203 F.3d 55. 60 (1st Cir.

32

2000).  As the Supreme Court has stated, a <u>Miranda</u> waiver has two distinct requirements:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception.  Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.  Only if the totality of the circumstances surrounding the interrogation reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the <u>Miranda</u> rights have been waived.

<u>Colorado v. Spring</u>, 479 U.S. 564, 573 (1987).

Following a recitation of <u>Miranda</u> rights, an express statement that a suspect is willing to make a statement, followed closely by a statement can constitute a waiver.  <u>North Carolina v. Butler</u>, 441 U.S. 369, 373 (1979).  "An express written or oral statement or waiver by a defendant of his right to remain silent or of the right to legal assistance of counsel, though not conclusive, is 'usually strong proof of validity of that waiver.'"  <u>United States v. Hack</u>, 782 F.2d 862, 866 (10th Cir. 1986) (*quoting* <u>North Carolina v. Butler</u>, 441 U.S. 369, 373 (1979)).

"To determine the voluntariness of a waiver, it is necessary to look at the totality of the circumstances, *see* <u>Arizona v. Fulminante</u>, 499 U.S. 279, 285 (1991), including 'the tactics used by the police, the details of the interrogation, and any

33

characteristics of the accused that might cause his will easily to be overborne.'" Palmer, 203 F.3d at 60 (*quoting* United States v. Rohrbach, 813 F.2d 142, 144 (8th Cir. 1987)). "Though courts must presume that a defendant did not waive his rights, *see* Jackson, 918 F.2d at 241, the government may prove a waiver by a preponderance of the evidence." Palmer, 203 F.3d at 60; Connelly, 479 U.S. at 168.

As is the case with the due process issue of voluntariness of a confession, the validity of a Miranda waiver is also a function of the presence or absence governmental misconduct. Connelly, 479 U.S. at 170 ("Miranda protects defendants against government coercion leading them to surrender rights protected by the Fifth Amendment; it goes no further than that."). "The voluntariness of a waiver of [the Fifth Amendment] privilege always depended on the absence of police overreaching, not on 'free choice' in any broader sense of the word." Id.; Palmer, 203 F.3d at 62 (*quoting* Connelly, 479 U.S. at 170).

Here, the Court heard undisputed testimony that Agent Bassett read Ramos his Miranda rights in Spanish and then asked and received affirmative responses in Spanish that Ramos understood his rights and was willing to answer questions posed to him by the agents. [Tr. 160]. The only evidence before this Court, and it comes from both Agent Bassett and Agent Davies, is

34

that questioning of Ramos did not begin until after he was read his _Miranda_ rights, stated that he understood them, agreed to be questioned by the agents, and memorialized that waiver and agreement by his signature on the handwritten document prepared at that time by Agent Davies. More importantly, there is no evidence before the Court that Ramos was coerced, threatened, improperly induced, or misled into waiving his _Miranda_ rights, or that Agent Bassett did not believe Ramos's affirmative responses to her questions about whether he understood his rights and wanted to answer questions from the agents. There was no discussion prior to the _Miranda_ waiver other than an introduction of the agents and a brief and accurate explanation of the intended purpose of the questioning. Absent police overreaching, of which there is no evidence, Ramos's waiver of his _Miranda_ rights must be found by this Court to have been voluntary, and his subsequent statements to be admissible. _Connelly_, 479 U.S. at 170.

This case differs fundamentally from the _Earle_ case decided by this Court in which post-_Miranda_ statements were suppressed based on "the unique circumstances" of that case. _See_ _United States v. Earle_, 2005 WL 5086870, *6 (D. Mass. 2005). Importantly, this Court found in _Earle_ that it was not established that the defendant even heard the _Miranda_ warnings

35

which were given in "the midst of a chaotic vehicle stop and
arrest." Id.  Moreover, there was no evidence in Earle that the
defendant indicated to the officer that he understood his Miranda
rights.  Id.  The defendant's subsequent written waiver was
discounted by this Court as nothing more than a signature the
defendant was instructed to place on a waiver form, which this
Court found the defendant did not read before following the
officer's instruction. Id. at *2, *7.

   The contrast to this case is unmistakable.  Here, Miranda
warnings were given in the quiet of an interview room at ICE
offices, the only two agents present introduced themselves and
informed Ramos that they were conducting an investigation into,
and wanted to talk to him about, whether he had transported
illegal aliens across the United States, the warnings were read
in Spanish directly from a Miranda rights card [Ex. 5], and Ramos
answered affirmatively that he understood his rights and was
willing to answer the agents' questions.  In other words, the
agents obtained a "textbook" waiver of Ramos's Miranda rights.
What more could have been expected of the agents is hard to
imagine.

   Ramos's counsel's emphasis on Agent Bassett's Spanish
language skills is unpersuasive.  Agent Bassett read from her
Miranda card in open court [Tr. 159], and there was no suggestion

36

from Ramos's counsel that she misread the warnings, or mispronounced any words.17 Nor is their any evidence before the Court that Ramos did not understand his rights and voluntarily waive them. In fact, the record shows that when informed he was under arrest, Ramos asked for a lawyer and all questioning stopped. His request for a layer, even if only toward the end of the interview, reflects an understanding of his <u>Miranda</u> rights.

**III.** <u>**CONCLUSION**</u>

The government asks this Court to find facts as proposed above, and on that basis, and for the reasons stated above, the government further asks this Court to deny the defendants' suppression motions.

                              Respectfully submitted,

                              MICHAEL J. SULLIVAN
                              United States Attorney

                         By:  <u>/s/ Timothy Q. Feeley</u>
                              TIMOTHY Q. FEELEY
                              Assistant U.S. Attorney
                              (617) 748-3172

April 6, 2007

---

17     Although the government asks this Court to strike Ramos's affidavit in support of his suppression motion, it is telling that in his affidavit Ramos does not suggest that Agent Bassett's Spanish language skills were so poor as to prevent effective communication between them. That is significant given that the interview was conducted primarily in Spanish, lasted a considerable period of time, and a great deal of detailed information was conveyed by Ramos to the agents. [Tr. 145-150].

<u>CERTIFICATE OF SERVICE</u>

This is to certify that I have this day served a copy of the foregoing upon counsel of record by electronic filing notice.


<u>/s/ Timothy Q. Feeley</u>
TIMOTHY Q. FEELEY
Assistant U.S. Attorney


April 6, 2007