UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA          )
                                  )
            v.                    )     CRIMINAL NO.  04-10198-MLW
                                  )
EDGAR RAMOS                       )


<u>MOTION IN LIMINE</u>

Defendant Edgar Ramos respectfully requests that this
Honorable Court exclude any evidence regarding the circumstances
of the seizure and search of the white passenger van.
Specifically, Mr. Ramos requests this Honorable Court exclude
any reference to September 11, 2001, the MBTA's high-alert
status, or suspicions of terrorism.  These references to
terrorism have no relevance to the crime alleged in the
indictment and thus no probative value.  In addition, any
references to terrorism are extremely prejudicial.


<u>Facts</u>

Edgar Ramos and John Mehia are charged with transporting
illegal aliens, in violation of 8 U.S.C. § 1324(a)(1)(A)(ii).
Mr. Ramos and Mr. Mehia were the drivers of a passenger van
which had traveled from Texas to Massachusetts.  On May 28, 2004
the van was parked in a legal spot outside of the MBTA station
at Sullivan Square.  The individuals in the van were seized and

the van was searched by MBTA police after arousing the suspicion of Patricia Pitts, an MBTA Inspector.

Ms. Pitts testified at a suppression hearing in this matter that the MBTA had been on "high alert" since September 11, 2001. On Thursday, May 27, 2004, the day prior to the arrests, Ms. Pitts was required to attend a terrorism training class given by the MBTA.  At the class she was told to pay attention to things in her work area and that if she saw something which she thought was out of the ordinary, to report it to someone. Tr. 31.  She was also taught that people writing things down, and "license plates . . . written on cardboard" could both be indicators of terrorist activities.  Tr. 33.

Ms. Pitts testified that she first noticed the white van as she was driving down the ramp to enter the MBTA station parking lot.  Tr. 29.  As Ms. Pitts set up at her booth, she noticed that the white van had one person sitting in the driver's seat and one person sitting in the front-passenger seat.  Tr. 30. This stood out to her because, in her experience, people park at the station and ride the MBTA, they do not park and sit in their cars.  Tr. 31.  From her booth, Ms. Pitts also noticed several men get out of the van for "just long enough to stretch their legs," and saw one of them write something down on a piece of paper.  Tr. 35; 43-44.  She also noticed that the individuals

2

had darker skin.  She testified that they appeared to hear that they were "Middle Eastern."  Tr. 43-44.

Ms. Pitts decided to further investigate by walking by the van.  Tr. 32.  As she walked by the van, she noticed that it had tinted windows, but she could see multiple people in the back of the van.  Tr. 40.  She also observed that the van had a paper license plate over a regular license plate.  While this license plate was paper, it was an officially licensed temporary Texas plate.  Tr. 80.

About 20 minutes after first noticing the van, Ms. Pitts contacted dispatch stating, "I might feel silly after this, but I noticed a van when I came down the ramp and I noticed it has a paper license plate and I also noticed that there were several gentlemen in the van."  Tr. 35-36. She further stated that she was probably "stereotyping" because she told dispatch that she thought the men looked Middle Eastern because, like her, they had darker skin.  Tr. 35-36; 57.  Within five minutes, MBTA police arrived on the scene.  Tr. 41.

Responding to the call for a suspicious vehicle, three MBTA officers approached in "somewhat tactical form."  One officer confronted the driver while another, "fearing for his safety" opened the front passenger side door of the van so that he could see the passenger's hands.  All the individuals were subsequently ordered out of the van.  Officer O'Hara later

testified that these precautions were based on the information
received from dispatch, including the information that the van
contained Middle Eastern males.  Tr. 81-82.  Mr. Ramos and
Mr. Mehia were later charged with Transporting Illegal Aliens.

<u>LEGAL ARGUMENT</u>

The circumstances of the defendants' seizure, including any
references to terrorism, are irrelevant to the charge of
transporting illegal aliens.  In order to prove a violation of §
1324(a)(1)(A)(ii), the government must prove four elements:  (1)
that the aliens were not lawfully in the United States; (2) that
the defendant knew or recklessly disregarded that fact; (3) that
the defendant transported the aliens; and (4) that the defendant
acted willfully in furtherance of the aliens' illegal presence
in the United States.  <u>United States v. Guerra-Garcia</u>, 336 F.3d
19, 23 (1st Cir. 2003).

"Relevant evidence" means "evidence having any tendency to
make the existence of any fact that is of consequence to the
determination of the action more probable or less probable that
it would be without the evidence."  Fed. R. Evid. 401.  The
circumstances of the stop and the suspicions of terrorism are
not relevant to any of the elements of § 1324(a)(1)(a)(ii), nor
to any fact that is of consequence in the case.  Because this
information is not relevant to any aspect of the case, it should
be excluded.  <u>See</u> Fed. R. Evid. 402.

4

Assuming, arguendo, that the circumstances of the stop had some marginal relevance, this information should still be excluded under Fed. R. Evid. 403 because any probative value it might have is substantially outweighed by the danger of unfair prejudice.  Evidence is unfairly prejudicial if it has an "undue tendency to suggest a decision on an improper basis, commonly, though not necessarily, an emotional one."  United States v. Varoudakis, 233 F.3d 113, 122 (1st Cir. 2000).  See also United States v. Currier, 836 F.2d 11, 18 (1st Cir. 1987) ("Unfairly prejudicial evidence ... is evidence that triggers the mainsprings of human action in such a way as to cause a jury to base its decision on something other than the established proposition in the case.")

References to terrorism, September, 11, 2001, or the MBTA's "high-alert" status and its subsequent "terrorism training" all have the potential to influence the jury and cause it to render its decision on an improper emotional basis.  See e.g. United States v. Fulmer, 108 F.3d 1486 (1st Cir. 1997).  In Fulmer, the First Circuit held that it was error to allow testimony relating to the Oklahoma City bombing in an unrelated criminal prosecution for threatening a federal agent.  While the Court recognized that the testimony regarding the bombing at the federal building in Oklahoma City might have "slight" probative value in that case in order to illuminate how the agent might

5

reasonably have perceived the defendant's words, the Court nevertheless held that this was outweighed by the "tremendous" danger of unfair prejudice. Id. at 1498. "Undue focus on evidence of the Oklahoma City bombing and resulting deaths, as well as subsequent bomb threats and evacuations, serves only to evoke and improper emotional response from the jury, distracting the jury from careful consideration of the relevant issues before it and thereby prejudicing [the defendant]." Id. at 1498.

References to terrorism are particularly prejudicial in an unrelated prosecution for a violation of the immigration laws. The September 11th attacks were perpetrated by non-citizens who exploited vulnerabilities in the U.S. immigration laws to enter and remain in the United States. In the wake of the attacks, these facts were widely publicized. Many members of the public now perceive a link between illegal immigration and terrorism and this public perception has fueled debate and policy changes in immigration law and enforcement: Since 2001 Congress has passed a variety of anti-terrorism bills that have included provisions relating to immigration on the theory that tougher immigration laws might have prevented the terrorist attacks and might stop a future attack. See Donald Kerwin & Margaret Stock, The Role of Immigration in a Coordinated National Security Policy, 21 Geo. Immigr. L. J. 383, 386 (2007)(reviewing the

changes to immigration laws since September 11, 2001).  Any

suggestion of terrorism in this case might prejudice the jury by

causing it to focus on these issues rather than whether the

government has proven each element of its case against the

defendants beyond a reasonable doubt.  Because this information

is not relevant to any issue in the case, and due to its

potential to prejudice the jury, it should be excluded under

F.R.E. 401, 402 and 403.

                                               EDGAR RAMOS
                                               By his attorney,

                                               /s/ Catherine K. Byrne

                                               Catherine K. Byrne
                                                 B.B.O. #543838
                                               Federal Defender Office
                                             408 Atlantic Ave., 3rd Floor
                                             Boston, MA  02110
                                             Tel: 617-223-8061

CERTIFICATE OF SERVICE

    I, Catherine K. Byrne, hereby certify that this document
filed through the ECF system will be sent electronically to the
registered participants as identified on the Notice of Electronic
Filing (NEF) and paper copies will be sent to those indicated as
non-registered participants on August 11, 2008.

                                               /s/ Catherine K. Byrne

                                             Catherine K. Byrne