UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | Cr. No. 04-10198-MLW |
| | ) | |
| EDGAR RAMOS and | ) | |
| JOHN MEHIA, | ) | |
| Defendants. | ) | |

MEMORANDUM AND ORDER

WOLF, D.J.                                    August 29, 2008

I.   SUMMARY

Defendants Edgar Ramos and John Mehia are charged with the unlawful transportation of aliens illegally in the United States in violation of 18 U.S.C. §1324. These charges are a result of an investigation conducted by the Massachusetts Bay Transit Authority ("MBTA") police at the MBTA's Sullivan Square station in Charlestown, Massachusetts on May 28, 2004.

As described in detail in this Memorandum, after the terrorist attacks in the United States on September 11, 2001 ("9/11"), MBTA personnel were instructed to be on alert for unusual activity that might suggest that a terrorist bombing of an MBTA facility was being planned or executed. On March 11, 2004, there was a highly publicized terrorist bombing of a train station in Madrid, Spain.

On May 28, 2004, an MBTA Inspector, who had MBTA terrorism training the day before, observed a van at the Sullivan Square station which aroused her suspicions for several reasons, including the facts that it was parked and occupied in an area that commuters

almost always left immediately, it had a Texas paper license plate, and it had tinted windows. The Inspector, reasonably but mistakenly, believed that the men who briefly got out of the van were of Middle Eastern origin. One of them appeared to be taking notes. Concerned that the men were plotting a terrorist attack, the inspector prompted the MBTA police to investigate the matter.

MBTA police officers came to the station, parked their cruiser behind the van, and approached it. They too observed the matters that had made the Inspector suspicious. Unable to see the hands of the passenger in the front seat or the people in the back of the van, and fearing that at least one of them had a weapon or a device to detonate explosives, an officer opened the front passenger side door and ordered the occupants to get out.

Subsequent, limited questioning and a review of the occupants' identification documents indicated that the people in the back of the van were Brazilians who had not been authorized to enter the United States. Therefore, Ramos and Mehia, the driver and front-seat passenger respectively, were taken into custody because it appeared that they were transporting illegal aliens.

United States Immigration and Customs Enforcement ("ICE") officers were called to assist in the investigation. ICE officers read Ramos and Mehia their <u>Miranda</u> rights in Spanish. The ICE officers assert that Ramos and Mehia acknowledged that they understood and waived those rights. Ramos and Mehia were

subsequently interviewed.

Ramos and Mehia moved to suppress all of the evidence against them, claiming that the MBTA officers violated their rights under the Fourth Amendment. More specifically, they contend that the MBTA officers did not have the constitutionally required reasonable, articulable suspicion for what the government concedes should be considered a stop of their vehicle at the Sullivan Square station. They also claim that the officers' subsequent conduct was unreasonable. Therefore, the defendants argue that the officers' seizures and searches violated their Fourth Amendment rights.

In addition, Ramos, but not Mehia, asserts that he did not knowingly and voluntarily waive his Miranda rights before speaking to the ICE agents. Therefore, he argues that his statements to them should be suppressed.

The court conducted an evidentiary hearing on the motion to suppress. It also received a succession of post-hearing memoranda as certain legal and factual issues came into sharper focus.

For the reasons explained in this Memorandum, the court concludes that the government has proven that the conduct of the MBTA officers was at all times reasonable and, therefore, did not violate the Fourth Amendment. In addition, the government has established that Ramos understood, and knowingly and voluntarily waived his Miranda rights before speaking to the ICE agents. Therefore, the motion to suppress is being denied.

3

II.  FACTS

     The following facts have been proven beyond a preponderance of the evidence.

     On May 28, 2004, Patricia Pitts had been employed by the MBTA for 20 years, most recently as an Inspector, at the MBTA's Sullivan Square station in Charlestown, Massachusetts.  As an Inspector, Pitts' duties included observing activities at the station and alerting the MBTA police of any suspicious activity.

     On 9/11, 19 men of Middle Eastern origin perpetrated terrorists attacks that killed several thousand people in the United States.  Following those attacks, the MBTA began training all of its employees to be alert for possible terrorist threats. On March 11, 2004, there was a highly-publicized terrorist bombing at a train station in Madrid, Spain.

     Pitts received her specialized MBTA terrorist training on May 27, 2004.  She returned to work at Sullivan Station at about 7:00 a.m. on May 28, 2004, the Friday before Memorial Day weekend.

     As Pitts arrived at the station she immediately noticed a large white van in the parking lot.  After entering her Inspector's booth, Pitts watched the van.  She quickly noted that the van had at least two people sitting in it.  She regarded this as unusual because the van was in an area in which commuters pay to park and leave immediately to get some form of public transportation.  Pitts saw two men get out of the van and observed one of them writing

4

something on a piece of paper. She had been taught the day before to watch particularly for people making notes at a MBTA station because they could be planning to plant explosives.

Therefore, Pitts decided to investigate the matter by walking by the van. As she did so, she noticed that the van had tinted windows. Nevertheless, she could see that there were several people in the back of the vehicle. In addition, she saw that the van had a Texas temporary paper license plate placed over a regular license plate. She had been taught in her terrorism class that paper license plates should also be regarded as suspicious.

As she walked past, Pitts, who is African-American, noted that the two men in the front seat of the van were also dark skinned and thought that they were Middle Eastern. This belief was reasonable in the circumstances, but mistaken because the men were actually of Mexican descent.

Because of the suspicions aroused by her observations, Pitts called the MBTA dispatcher in order to get the MBTA police to investigate further. The MBTA police were told that the dispatcher had just received a call from the Inspector at Sullivan Square station. The dispatcher went on to say:

> Sullivan lower parking lot. There are two, two vans pulled up, uh, and one of them had a paper plate. A couple of guys got out of them, believe it or not, of Middle Eastern descent. She described them as to be on [second hand]. It made her feel very uncomfortable. She saw them congregatin' and one had a paper plate. So, she was wondering if we could send[].

Exhibit 6 at 1 (alterations in original).

MBTA Patrolman Steven O'Hara and his partner Officer Silen were the first officers to respond to the dispatch. O'Hara had been an MBTA Patrolman for more than seven years. After 9/11, he had received specialized terrorist training which was far more extensive than Pitt's one day class.

O'Hara knew that the 9/11 terrorists were Middle Eastern men. Although not articulated, the dispatcher's reference to Middle Eastern men communicated to O'Hara that the Inspector was concerned about a possible terrorist attack. O'Hara had been taught that the next terrorist attack could be at a metropolitan transit station. He knew of the then recent bombing of a train station in Madrid. O'Hara had been taught to be particularly suspicious of any vehicle that could hold a large amount of explosives like a van.

O'Hara was also very familiar with the Sullivan Square station. He had worked there and his duties included doing protective patrols. Like Pitts, O'Hara knew that people did not stay in their vehicles in the area of the parking lot in which the van was parked. He knew that it was necessary to pay to park in that area, and that there was another area where people who are dropping off or picking up passengers could wait for free.

O'Hara saw the van as his cruiser pulled into the station. The officers parked their cruiser about 15 feet behind the van, at an angle so they could get a clear view of both sides of it. A

6

second cruiser driven by MBTA Officer Federico arrived and parked opposite O'Hara and Silen's cruiser.

O'Hara was concerned that the van might contain explosives to be used in a terrorist attack. He and Silen approached the van in what O'Hara characterized as a "tactical" formation, with Silen on the driver's side and O'Hara on the passenger side. They were in uniform. Their guns were not drawn.

O'Hara observed the temporary paper plate, which he had been trained to regard as suspicious. In addition, he saw that it was a Texas plate, which was unusual. Ordinarily, vehicles at the station had Massachusetts plates, or occasionally New Hampshire or Rhode Island plates. It was very uncommon to see plate from as far away as Texas.

O'Hara also saw that all of the windows of the van behind the front seat were tinted. Nevertheless, he observed the shadows of several heads in the back of the van, which seemed to have several seats. O'Hara considered it suspicious that many people, who could not be seen, were sitting in a van, that was parked in an area in which people regularly exited their vehicles after parking.

When O'Hara reached the front passenger side window, he could not see the passenger's hands. O'Hara had been taught that it is particularly important to be able to see a person's hands because "hands can kill you." He was concerned that the passenger, who he understood from the dispatch to be Middle Eastern, might be holding

a weapon or a device that could detonate an explosive. He was also concerned that the people in the back seats, who he could not see clearly, might be dangerous.

Fearing for his safety, O'Hara opened the front passenger side door and asked, "What are you guys doing here?" When he did not receive an immediate response, O'Hara ordered the front seat passenger to get out of the van in an effort to assure his safety and that of Silen. Silen similarly directed the driver to get out of the van. After the driver, who was Ramos, and front seat passenger, who was Mehia, got out of the van, the officers opened the rear door and asked the people in the back seats to get out one at a time for safety reasons. The passengers complied with this request.

After everyone was out of the van, one of the officers radioed the dispatcher and said, "We're suspicious, Middle Eastern male." Exhibit 6 at 2. Two more officers subsequently arrived at the scene.

O'Hara then asked Ramos for his identification. Ramos provided his Texas driver's license and a passenger manifest. Id. The passengers who were in the back seat responded to the request for identification by producing Brazilian passports. However, the passports did not include visas to enter the United States or stamps indicating lawful entry through a United States port. The passports did contain stamps showing entry into Mexico. The

8

officers suspected that the passengers were illegal aliens who were being unlawfully transported by Ramos and Mehia. Accordingly, O'Hara searched the van, retained Ramos and Mehia's wallets, and had everyone transported to MBTA police headquarters.

When Ramos, Mehia, and their Brazilian passengers were transported to the MBTA Police headquarters, the officers did not intend to let them leave until further investigation was conducted. A reasonable person would have understood this. Therefore, Ramos and Mehia were then in custody.

However, the MBTA officers did not tell Ramos and Mehia that they were under arrest. Nor were <u>Miranda</u> warnings given to them by the MBTA officers.

Richard Davies and John Lindstrom, who were ICE agents, came to the MBTA police headquarters to participate in the further investigation. They too saw that the Brazilian passports had no visas or stamps indicating that the passengers in the van had been authorized to enter the United States. Therefore, they too suspected that Ramos and Mehia had been involved in unlawfully transporting illegal aliens.

After about five and one-half hours at the MBTA police headquarters, Ramos and Mehia were taken to the ICE office in Boston, Massachusetts at about 1:30 p.m. Before leaving, Lindstrom, in Spanish and English, asked Ramos and Mehia their names, their citizenship, and whether either had any medical

problem.  They were also asked to identify their property.  Ramos and Mehia responded to the inquiries.  Ramos identified as his a wallet that contained gas and toll receipts for the trip from Texas to Massachusetts and more than $3600 in cash.  No <u>Miranda</u> warnings were given to Ramos or Mehia before they were questioned by Lindstrom.

At approximately 3:40 p.m., at the ICE office, Ramos was questioned further by Davies' supervisor Cheryl Bassett.  Bassett was a functional but not fully fluent Spanish speaker.  She had attended a five-week, forty-hour-per-week Spanish language course in 1997, and had lived and worked for ICE in a Spanish-speaking country for six months in 2002.  Bassett questioned Ramos in Spanish because he spoke only limited English and was manifestly more comfortable speaking in Spanish.  Davies took notes.

At the outset of the interview, Bassett read Ramos his <u>Miranda</u> rights from a card on which they were written in Spanish that she carried.  She asked in Spanish if Ramos understood those rights, which included the right to remain silent, the right to have an attorney while being questioned and the warning that anything Ramos might say could be used against him.  In response to Bassett's inquiry, Ramos stated, in some form of words, that he understood his rights.  Bassett then read from the card, in Spanish, the next question, "Are you willing to answer some questions?"  Ramos

responded, in Spanish, either "yes" or "I wish to speak."[1]

After Ramos orally acknowledged that he understood his rights and wished to speak to the agents, Bassett wanted him to confirm this in writing. However, Bassett was unable to find ICE's standard Spanish <u>Miranda</u> rights waiver form for Ramos to sign. Therefore, Davies improvised a form. The document contained only two sentences, in English, each of which contained misspellings or grammatical errors. Specifically, the form said: "Dou [sic] understand your rights" and "Do wish to speak with these officers without your lawyer present." Ex. 2. Neither statement ended with a question mark. Ramos signed the form.

---

[1]In her testimony at the suppression hearing, Bassett read this card aloud in Spanish. Defense counsel did not point out any errors or inconsistencies in her reading of it. Both Bassett and Davies testified that, after Bassett read the <u>Miranda</u> card, Ramos gave some kind of affirmative responses when Bassett asked him in Spanish: Do you understand these rights? and Are you willing to answer some questions? However, Bassett gave conflicting and somewhat confusing testimony regarding what Ramos' response was when she asked him, in Spanish, whether he wished to answer questions. Bassett initially testified that, in response to her question, Ramos said "quiere hablar" (you wish to speak). Jan. 11, 2007 Tr. at 160-61. Later she credibly clarified that she had made a grammatical error when she testified and that Ramos had actually said "quiero hablar" (I wish to speak). <u>Id.</u> at 181. Davies testified that he recalled Ramos answering either "yes" or answering in English and Spanish in response to Davies' questions relating to his <u>Miranda</u> rights. <u>Id.</u> at 99, 158, 125-26.

Despite the imperfections in Bassett's testimony in Spanish, the court is persuaded that she read Ramos his <u>Miranda</u> rights in Spanish correctly from her card, and that he responded that he understood them and nevertheless wished to speak to the agents.

Bassett then interviewed Ramos in Spanish for almost two hours, primarily in Spanish. She was able to communicate comfortably with Ramos throughout the interview.

III. ANALYSIS

Ramos and Mehia each assert that the MBTA officers' conduct violated their Fourth Amendment rights. In addition, Ramos, but not Mehia, alleges that his <u>Miranda</u> rights were violated at MBTA police headquarters and at the ICE office.

As the government has represented that it will not attempt to introduce Ramos' statements at the MBTA police headquarters, the court is not deciding whether those statements should be suppressed. For the reasons explained below, the remaining grounds for possible suppression are not meritorious.

    A.    <u>The Stop, Seizures, and Searches Were Lawful</u>

Ramos and Mehia each contend that their Fourth Amendment rights were violated when the police approached the van, O'Hara opened the front passenger-side door, and the officers ordered them out. Therefore, they request that all evidence that flowed from their initial encounter with the MBTA police at Sullivan Square station be suppressed.

It is axiomatic that "a court may not exclude evidence under the Fourth Amendment unless it finds that an unlawful search or seizure violated the defendant's own constitutional rights." <u>United States v. Payner</u>, 447 U.S. 727, 731 (1980). As the

12

government recognizes, a stop of a vehicle and the detention of its occupants is a seizure protected by the Fourth Amendment with regard to a passenger as well as to the driver. See United States v. Kimball, 25 F.3d 1, 5-6 (1st Cir. 1994). Therefore, the court must decide if the conduct of the MBTA police on May 28, 2004 violated the Fourth Amendment rights of both Ramos, who was in the driver's seat of the van, and of Mehia, who was a passenger.

In this case, the van was parked at the Sullivan Square station when the MBTA officers approached it. The van was not literally "stopped" by them. Ordinarily, a police officer's conduct does not implicate or violate the Fourth Amendment when he merely approaches a person and asks him questions. See United States v. Mendenhall, 446 U.S. 544, 555 (1980); United States v. Smith, 423 F.3d 25, 28 (1st Cir. 2005). However, here "the government is not seeking to justify the interactions between the MBTA officers and the defendants as a consensual encounter" protected by the principle pronounced in Mendenhall. Gov. Req. For Findings of Fact and Rulings of Law, and Supplemental Memorandum in Opposition to Defendant's Suppression Motion at 3 n.2. Therefore, the court has considered whether the officers' conduct from the time they parked their cruisers violated the Fourth Amendment.

The Fourth Amendment protects each person's right not to be subject to "unreasonable searches and seizures." U.S. Const.,

Amendment IV.[2]  Therefore, the fundamental command of the Fourth Amendment is that any government search or seizure must be reasonable. "[A] brief investigatory stop 'constitutes a seizure within the purview of the Fourth Amendment and, therefore, is subject to the constitutional imperative that it must be reasonable under all of the circumstances.'" United States v. Coplin, 463 F.3d 96, 100 (1st Cir. 2006) (quoting United States v. Romain, 393 F.3d 63, 70-71 (1st Cir. 2004)); see also United States v. Ruidiaz, 529 F.3d 25, 28 (1st Cir. 2008) ("Because even a temporary police detention constitutes a seizure under the Fourth Amendment, that detention must be reasonable in order to pass constitutional muster.").

"[T]here is 'no ready test for determining reasonableness other than by balancing the need to search [or seize] against the invasion which the search [or seizure] entails.'" Terry v. Ohio, 392 U.S. 1, 21 (1968) (quoting Camara v. Municipal Court, 387 U.S. 523, 534-35, 536-37 (1967)).  The totality of the facts and circumstances of each case determines whether a search or seizure is reasonable.  See United States v. Cortez, 449 U.S. 411, 417

---

[2]The Fourth Amendment states:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

14

(1981); <u>United States v. Espinoza</u>, 490 F.3d 41, 45 (1st Cir. 2007).

The issue is whether the conduct in question is objectively reasonable. <u>See Terry</u>, 392 U.S. at 21; <u>United States v. Hensley</u>, 469 U.S. 221, 232-33 <u>Ruidiaz</u>, 529 F.3d at 28; <u>United States v. Taylor</u>, 511 F.3d 87, 90 (1st Cir. 2007); <u>Espinoza</u>, 490 F.3d at 46; <u>Coplin</u>, 463 F.3d at 100.  "'[S]ubjective intent alone . . . does not make otherwise lawful conduct illegal or unconstitutional.'" <u>Whren v. United States</u>, 517 U.S. 806, 813 (1996) (quoting <u>Scott v. United States</u>, 436 U.S. 128, 138 (1978)); <u>see also Ruidiaz</u>, 529 F.3d at 28.

"[A} police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest." <u>Terry</u>, 392 U.S. at 22.  However, "in justifying the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant that intrusion." <u>Id.</u> at 21; <u>see also United States v. Stanley</u>, 915 F.2d 54, 55 (1st Cir. 1990).  "This means . . . that [any] stop must be supported by a reasonable and articulable suspicion of criminal activity." <u>United States v. Chhien</u>, 266 F.3d 1, 5 (1st Cir. 2001).  "[R]easonable suspicion requires more than mere hunch but less than probable cause." <u>Ruidiaz</u>, 529 F.3d at 29.

The "court must ask whether the officer's action were

15

justified at their inception, and if so, whether the officer's
subsequent actions were fairly responsive to the emerging tableau
- the circumstances originally warranting the stop, informed by
what occurred, and what the officers learned, as the stop
progressed." <u>Chhien</u>, 266 F.3d at 6; <u>see also</u> <u>Ruidiaz</u>, 529 F.3d at
29; <u>Stanley</u>, 915 F.2d at 55.

> This inquiry is fact-sensitive, and the requisite
> objective analysis must be performed in real-world terms.
> In other words, reasonableness requires a practical,
> commonsense determination - a determination that entails
> a measurable degree of deference to the perception of
> experienced law enforcement officers . . . .

<u>Ruidiaz</u>, 529 F.3d at 29.

"[A] combination of independently innocent behaviors and
circumstances . . . can create reasonable suspicion . . . ."
<u>United States v. Wooodrum</u>, 202 F.3d 1, 7 (1st Cir. 2000); <u>see also</u>
<u>United States v. Harty</u>, 476 F. Supp. 2d 17, 23 (D. Mass. 2007). In
determining whether reasonable, articulable suspicion exists, "'the
relevant inquiry is not whether particular conduct is 'innocent' or
'guilty,' but the degree of suspicion that attaches to particular
types of noncriminal acts.'" <u>United States v. Sokolow</u>, 490 U.S. 1,
10 (1989) (quoting <u>Illinois v. Gates</u>, 462 U.S. 213, 243-44 n.13
(1983)) (finding legal conduct such as paying cash for plane
tickets, making a very short trip to Miami, and traveling under an
alias sufficient to create reasonable suspicion). Indeed, "<u>Terry</u>
itself involved 'a series of acts, each of them perhaps innocent'
if viewed separately, 'but which taken together warranted further

investigation.'" <u>Id.</u> at 9-10 (quoting <u>Terry</u>, 392 at 22 (1968)).[3]

The location where conduct occurs also bears on whether it is sufficiently suspicious to justify further investigation. For example, the Supreme Court has stated that in the vicinity of the Mexican border "'the likelihood that any given person of Mexican ancestry is an alien is high enough to make Mexican appearance a relevant factor' . . . . Different considerations would arise if, for example, reliance were put on apparent Mexican ancestry at a checkpoint operated near the Canadian border." <u>United States v. Martinez-Fuerte</u>, 428 U.S. 543, 564 n. 17 (1976) (quoting <u>United States v. Brignoni-Ponce</u>, 422 U.S. 873, 886-87 (1975)). Similarly, the First Circuit has held that "police are permitted to take the character of the neighborhood into account in deciding whether a stop is appropriate . . . ." <u>United States v. McKoy</u>, 428 F.3d 38, 40 (1st Cir. 2005); <u>see also United States v. Soares</u>, 521 F.3d 117, 121-22 (1st Cir. 2008); <u>United States v. Stroman</u>, 500 F.3d 61, 64 (1st Cir. 2007); <u>United States v. Ivery</u>, 427 F.3d 69, 73 (1st Cir.

_____

[3]In <u>Terry</u>, an officer's observation of the defendants legally pacing and conferring numerous times in front of a store window, combined with their lack of response to his inquiry about what they were doing, made it reasonable within the constraints of the Fourth Amendment for the officer to detain and frisk them. 392 U.S. at 6, 28.  In light of all the circumstances, the Court found the stop and frisk to be "the tempered act of a policeman who in the course of an investigation had to make a quick decision as to how to protect himself and others from possible danger, and took limited steps to do so." <u>Id.</u> at 28.

2005). As these cases recognize, particular conduct may reasonably arouse suspicion in one place when it would not be suspicious in another place. Thus, in the instant case, common sense indicates that it was permissible for the police to consider that the conduct in question was occurring at a public transportation facility which, as the then recent Madrid bombing suggested, might be a particularly attractive target for a terrorist attack.

Common sense and case law also indicate that the assessment of whether conduct is reasonable for Fourth Amendment purposes may properly be influenced by the degree of danger that is being investigated. In other words, the gravity of the potential danger being addressed is one of the totality of the circumstances to be considered. For example, in <u>Florida v. J.L.</u>, 529 U.S. 266, 273-74 (2000), the Supreme Court stated, "[w]e do not say, for example, that a report of a person carrying a bomb need bear the indicia of reliability we demand for a report of a person carrying a firearm before the police can constitutionally conduct a frisk." Similarly, in finding that checkpoints established to stop vehicles to search for drugs were unconstitutional, the Supreme Court stated, before 9/11, that "the Fourth Amendment would almost certainly permit an appropriately tailored roadblock set up to thwart an imminent terrorist attack or to catch a dangerous criminal who is likely to flee by way of a particular route." <u>City</u>

of Indianapolis v. Edmond, 531 U.S. 32, 44 (2000).[4]


        The Seventh Circuit has written that:

        the amount of permissible intrusion is a function not
        only of the likelihood of turning up contraband or
        evidence of crime but also of the gravity of the crime
        being investigated. . . . In other words, if the crime
        being investigated is grave enough, the police can stop
        and frisk without as much suspicion as would be required
        in a less serious criminal case.

United States v. Goodwin, 449 F.3d 766, 769 (7th Cir. 2006).

        Moreover, as the First Circuit stated in the context of gun

crimes, "[f]or the words 'reasonably' and 'circumstances' an

important consideration is the calendar - the times."   United

States v. Villanueva, 15 F.3d 197, 199 (1st Cir. 1994).  Although

the courts must be vigilant and rigorous in preventing 9/11 from

─────────────

        [4]The Supreme Court's statement in Edmond echoes Justice
Robert Jackson's observation in 1949 that:

        If . . . a child is kidnaped and the officers throw a
        road block about the neighborhood and search every
        outgoing car, it would be a drastic and
        undiscriminating use of the search.  The officers might
        be unable to show probable cause for searching any
        particular car.  However, I should candidly strive hard
        to sustain such action, executed fairly and in good
        faith, because it might be reasonable to subject
        travelers to that indignity if it was the only way to
        save a threatened life and detect a vicious crime.  But
        I should not strain to sustain such a roadblock and
        universal search to salvage a few bottles of bourbon
        and catch a bootlegger.

Brinegar v. United States, 338 U.S. 160, 183 (Jackson, J.,
dissenting).

19

being casually or carelessly used as an excuse for ignoring the requirements of the Fourth Amendment, common sense compels the conclusion that in certain circumstances, including those involved in the instant case, conduct that arguably might not have been sufficiently threatening to justify a brief investigatory stop in an earlier era may be reasonable in a nation that experienced a terrible terrorist attack only several years before.

The instant case also presents the issue of whether after 9/11 it is permissible to take perceived race or ethnicity into account in determining whether the reasonable, articulable suspicion necessary to make a valid Terry stop exists. The dispatch that prompted the officers to approach the van to investigate Pitts' concerns further emphasized that the "guys" the Inspector observed were of Middle Eastern descent. See Ex. 6. This turned out to be incorrect because Ramos and Mehia are actually of Mexican descent. "Stops premised on mistakes of fact, however, generally have been held constitutional so long as the mistake is objectively reasonable." Coplin, 463 F.3d at 101. In this case, the mistake was objectively reasonable. The court concludes that the officers were motivated in their actions in part by their understanding that the men they were investigating were, like the 9/11 terrorists, of Middle Eastern descent. The reference to Middle Eastern men prompted O'Hara to understand correctly that it was concern about a possible terrorist bombing, rather than car theft or some other

20

common crime, that prompted the Inspector to ask the MBTA police to investigate further. It also heightened O'Hara's suspicion of the men he expected to encounter.

The government contends that the officers' perception that they were investigating Middle Eastern men should be cognizable in deciding whether they had the required reasonable, articulable suspicion. This argument relies primarily on language in the Supreme Court's 1975 decision holding that the Fourth Amendment did not allow a roving patrol to stop a vehicle near the Mexican border and question its occupants solely because of their apparent Mexican ancestry. See Brigoni-Ponce, 422 U.S. at 885-86. However, the Court stated, in dicta, that, "[t]he likelihood that any given person of Mexican ancestry is an alien is high enough to make Mexican appearance a relevant factor, but standing alone it does not justify stopping all Mexican-Americans to ask if they are aliens." Id. at 886-87. See also Martinez-Fuerte, 428 U.S. at 564 n.17 (because 20% of the vehicles stopped near Mexican border because of the occupant's apparent Mexican ancestry contained illegal aliens, reliance on perceived ancestry was relevant to the law enforcement need being served and was permissible); United States v. Weaver, 966 F.2d 391, 395 n.2 (8th Cir. 1992) (police could assume certain black males were more likely to be drug couriers in context of known drug trafficking activities of black gang members); Castenada v. Commonwealth, 376 S.E.2d 82, 83 (Va.

Ct. App. 1989) (black and Hispanic individuals are more likely to be drug couriers).

The government argues that after the 9/11 terrorist attacks perpetrated solely by Middle Eastern men, apparently being of Middle Eastern origin is a factor that officers can properly rely upon in deciding whether to make a Terry stop when they are concerned about a possible bombing at a public transit facility. The government agrees, however, that perceived ancestry alone would not be sufficient justification for such a stop.

The defendants assert that their perceived Middle Eastern ancestry is not a factor that could lawfully support the initial stop in this case, and to conclude otherwise would abet unlawful racial profiling and discrimination. Among other things, the type of statistics relied upon in Brignoni-Ponce and Martinez-Fuentes have not been presented here. Nor, defendants contend, could they be. Rather, they argue that while a significant percentage of all people of apparent Mexican descent near the Mexican border might be illegal aliens, statistics would not show that a meaningful percentage of Middle Eastern men at public transportation facilities are terrorists.

The defendants also argue that the language in Brignoni-Ponce on which the government relies should no longer be considered as valid dicta. See United States v. Montero-Camargo, 208 F.3d 1122, 1135 (9th Cir. 2000) (en banc). The Supreme Court has made clear

that race may be used by the government only in the most
exceptional circumstances. See, e.g., Adarand Constructors, Inc. v.
Pena, 515 U.S. 200, 227 (1995) ("[W]e hold today that all racial
classifications, imposed by whatever federal, state, or local
governmental actor, must be analyzed by a reviewing court under
strict scrutiny."); Saenz v. Roe, 526 U.S. 489, 505 (1999) (holding
that where the right "to be treated equally" is at stake,
"discriminatory classification is itself a penalty"). Morever, the
Ninth Circuit has found that the stigma of governmental
classifications based on race, which the Supreme Court has acted to
eliminate:

> is far more pronounced in the context of police stops in
> which race or ethnic appearance is a factor. So, too, are
> the consequences of 'notions of racial inferiority' and
> the 'politics of racial hostility[.]' . . . Stops based
> on race or ethnic appearance send the underlying message
> to all our citizens that those who are not white are
> judged by the color of their skin alone. Such stops also
> send a clear message that those who are not white enjoy
> a lesser degree of constitutional protection – that they
> are in effect assumed to be potential criminals first and
> individuals second.

Montero-Camargo, 208 F.3d at 1135. Other courts, both federal and
state, have reached a similar conclusion. See United States v.
Slocum, 464 F.2d 1180, 1184 (3d Cir. 1972) (recognizing in the
Fourth Amendment context that police profiles used to screen
potential plane hijackers may not "discriminate against any group
on the basis of religion, origin, political views, or race");
Whitfield v. Board of County Comm'rs, 837 F. Supp. 338, 344 (D.

Colo. 1993) ("While race is an appropriate characteristic for identifying a particular suspect, it is wholly inappropriate to define a class of suspects."); <u>People v. Bower</u>, 597 P.2d 115, 119 (Cal. 1979) ("A person's racial status is not an 'unusual' circumstance" contributing to reasonable suspicion); <u>State v. Kuhn</u>, 517 A.2d 162, 165 (N.J. App. Div. 1986) ("No rational inference may be drawn from the race of one to be detained that he may be engaged in criminal activities."); <u>People v. Johnson</u>, 102 A.D.2d 616, 622 (N.Y. App. Div. 1984) (race is relevant in context of physical description but "[a] person's racial status is neither an unusual circumstance nor probative of propensity to commit crime").

The parties' dispute concerning the relevance of being perceived to be of Middle Eastern descent to an investigation of possible terrorist activity raises an important issue. However, it is neither necessary nor appropriate to decide this issue in the instant case. As explained earlier, the test for determining whether a <u>Terry</u> stop was lawful is one of objective reasonableness. See <u>Terry</u>, 392 U.S. at 21; <u>Hensley</u>, 469 U.S. at 232-33; <u>Whren</u>, 517 U.S. at 813; <u>Ruidiaz</u>, 529 F.3d at 28 (1st Cir. 2008); <u>Taylor</u>, 511 F.3d at 90; <u>Espinoza</u>, 490 F.3d at 46; <u>Coplin</u>, 463 F.3d at 100. As the Supreme Court wrote in <u>Whren</u>, its decisions:

> foreclose any argument that the constitutional reasonableness of traffic stops depends on the actual motivations of the individual officers involved. We of course agree . . . that the Constitution prohibits selective enforcement of the law based on considerations such as race. But the constitutional basis for objecting

to intentionally discriminatory application of the laws
is the Equal Protection Clause, not the Fourth Amendment.
<u>Subjective intentions play no role in ordinary, probable-
cause Fourth Amendment analysis</u>.

517 U.S. at 813 (emphasis added).  Subjective intentions also play
no role in determining whether a <u>Terry</u> stop is justified by
reasonable, articulable suspicion.  As the First Circuit has stated
with regard to a <u>Terry</u> stop, "[r]easonableness in this context is
a construct that must be judged according to objective criteria; it
is not dependent on an individual officer's subjective motives."
<u>Ruidiaz</u>, 529 F.3d at 29.

    In the instant case, the facts in addition to the defendants'
mistakenly perceived Middle Eastern origins provided reasonable
justification for each of the actions taken at the Sullivan Square
station by the MBTA officers in this case.  It was permissible for
the officers to understand from the dispatcher's reference to men
of Middle Eastern descent that the Inspector was asking for further
investigation of a possible terrorist bombing rather than a common
crime.  Assuming, without finding, that the officers' further
actual reliance upon the dispatched information describing the
defendants as men of Middle Eastern descent was impermissible,
"'their subjective intent alone . . . does not make [their]
otherwise lawful conduct illegal or unconstitutional.'" <u>Whren</u>, 517
U.S. at 813 (quoting <u>Scott</u>, 436 U.S. at 138).

    Before analyzing whether O'Hara's actions were at each stage
of his investigation were objectively reasonable it is necessary to

address whether the information known to Inspector Pitts but not
communicated to the MBTA officers who responded to the dispatch can
be considered under the "collective knowledge" or "fellow officer"
rule. See United States v. Meade, 110 F.3d 190, 193-94 (1st Cir.
1997). "Under the 'fellow-officer' rule, law enforcement officials
cooperating in an investigation are entitled to rely upon each
other's knowledge of facts when forming the conclusion that a
suspect has committed or is committing a crime." Id. Similarly,
"where law enforcement officers are jointly involved in executing
an investigative stop, the knowledge of each officer should be
imputed to others jointly involved in executing the stop." United
States v. Cook, 277 F.3d 82, 86 (1st Cir. 2002).

     Pitts is not an MBTA police officer like O'Hara and the others
who responded to the dispatch, but she is a fellow MBTA employee.
The First Circuit has "not directly addressed the question whether
the collective-knowledge rule is limited to situations in which the
knowledge vests in a pertinent individual – such as the directing
or arresting officer – or whether the rule broadly encompasses
situations in which the officers or agency as a whole possess the
requisite information." Meade, 110 F.3d at 194.

     In the instant case, the government does not argue for an
expansive interpretation of the "fellow officer" rule and,
therefore, does not request that information known to Pitts but not
communicated by the dispatcher be imputed to O'Hara and his

colleagues who responded to the dispatch.  See Gov. Req. For
Findings of Fact and Rulings of Law, and Supplemental Memorandum in
Opposition to Defendant's Suppression Motion at 17 n.7.  Thus, the
court is not considering information - such as the fact that one of
the men Pitts observed was taking notes - which was not
communicated to the officers.

However, the dispatch did inform the officers that the
Inspector was "very uncomfortable."  Ex. 6.  A reasonable police
officer would, like O'Hara, have known that an Inspector is an
employee charged, in part, with monitoring the station for
suspicious activity and who has the experience to recognize conduct
that is out of the ordinary.  In the context of informants, the
Supreme Court has "reject[ed] . . . [the] argument that reasonable
cause for a stop and frisk can only be based on the officer's
observations . . . ."  Adams v. Williams, 407 U.S. 143, 147 (1972).
Rather, it held that, "when a credible informant warns of a
specific impending crime [,] the subtleties of the hearsay rule
should not thwart an appropriate police response."  Id.; see also
J.L., 529 U.S. at 269 (contrasting anonymous tip from "a tip from
a known informant whose reputation can be assessed").  Similarly,
in deciding how to proceed it was reasonable for the MBTA officers
to rely on the fact that the Inspector at the Sullivan Square
station was "very uncomfortable."

The dispatch also provided additional information that was

27

relevant to whether the initial stop was justified.  It told the officers that there were "guys" in a van "congregatin" in the lower parking lot of the Sullivan Square station.[5]  Like O'Hara, a reasonable MBTA police officer would have known that it was very unusual for people to stay with their vehicles in that parking lot. Therefore, such an officer would have understood the Inspector's view that this was suspicious.

The dispatcher's reference to a paper license plate would have elevated the suspicion of a reasonable officer.  In her one-day terrorism training Pitts had been instructed to regard paper license plates as suspicious.  The MBTA police received more extensive terrorism training and, the court infers, were also taught that paper license plates were at times associated with illegal activity and, therefore, suspicious.

The reference to the men who were congregating in the Sullivan Square lower parking lot as of Middle Eastern descent would have accurately, as a form of mutually understood shorthand, communicated to a reasonable officer that the Inspector was concerned about a possible terrorist bombing, rather than a common crime such as car theft.  This concern would have reasonably been reinforced by the fact that the vehicle the officers were being

---

[5]The dispatch stated that there were two vans in the lower lot. The court does not find this error to be objectively reasonable.  Therefore, it is not considering the reported second van in deciding whether the required reasonable, articulable suspicion exists.  See Coplin, 463 F.3d at 1001.

asked to investigate was a van, which would have the capacity to contain a large amount of explosives. Therefore, a reasonable officer would have believed that he was embarking on an investigation of potentially grave danger, which would justify some action that might not be warranted if only a risk of a much less menacing crime was presented. See J.L., 529 U.S. at 273-74; Edmond, 531 U.S. at 44; Goodwin, 449 F.3d at 769; Villaneuva, 15 F.3d at 199.

The court recognizes that there was not a specific threat of a terrorist bombing. If there had been, the justification for a Terry stop would have been increased greatly. However, in the circumstances of this case, an explicit threat was not necessary to provide the reasonable, articulable suspicion required at the outset of the officers' encounter with the van and its occupants.

As described earlier, the officers' own initial observations confirmed the accuracy of the Inspector's report and the suspicious circumstances described in the dispatch. The van was spotted immediately after the officers drove into the station. Like O'Hara, a reasonable MBTA officer would have known that it was very unusual for people to remain at or in a vehicle in the lot in which the van was parked.

The government does not contend that the foregoing information was sufficient to justify an arrest. However:

> In Terry [the Supreme Court] recognized that "a police
> officer may in appropriate circumstances and in an

29

> appropriate manner approach a person for purposes of
> investigating possibly criminal behavior even though
> there is no probable cause to make an arrest." . . . A
> brief stop of a suspicious individual, in order to
> determine his identity or to maintain the status quo
> momentarily while obtaining more information, may be most
> reasonable in light of the facts known to the officer at
> the time.

Adams, 407 U.S. at 146 (quoting Terry, 392 U.S. at 21-22). At the time the officers parked their cruiser behind the van, the facts known to them made it objectively reasonable to seek to maintain the status quo and to obtain more information.

As described earlier, the MBTA officers did not literally "stop" the van. However, the government is not seeking to justify the interactions between the officers, Ramos, and Mehia as a consensual encounter, which requires no justification. See Mendenhall, 446 U.S. at 555. Accepting that the parking of the cruiser behind the van and the approach of the officers constituted a Terry "stop," the intrusion on defendants' Fourth Amendment interests were initially minimal. The van was not moving. Nor was the motor running. Therefore, the initial encounter did not interfere with a manifest desire of the defendants to go somewhere else or delay their travel. Balancing the need to detain the defendants briefly presented by the articulable suspicious facts recounted earlier against the limited invasion of their Fourth Amendment interests that the initial approach to the van involved, the officers' actions were at the inception objectively reasonable. See Terry, 392 U.S. at 21.

The officers approached the van in a permissible manner. They were in uniform, but their weapons were not drawn. To promote safety, one officer went to the driver's side and the other went to the passenger's side. This was prudent and not unusually or unduly invasive.

As he approached the vehicle, O'Hara saw that, as reported by the Inspector, it had a paper license plate. He reasonably regarded the paper license plate as suspicious though not unlawful.

O'Hara also then learned for the first time that it was a Texas plate. It was very unusual for a vehicle with a plate from a state far from Massachusetts to be parked at the Sullivan Square station. This properly added to the officers' suspicion. See United States v. Espinosa, 782 F.2d 888, 891 (10th Cir. 1988) (temporary license plate from Florida on a vehicle in New Mexico, when Florida was a well-known source of illegal drugs, contributed to reasonable suspicion).

In approaching the van, the officers also obtained more important information – the facts that all of the windows behind the front seat were tinted, but the shadows of several heads could be seen in the back, which seemed to have several seats. The Supreme Court has repeatedly found that "investigative detentions involving suspects in vehicles are especially fraught with danger to police officers." Michigan v. Long, 463 U.S. 1032, 1047 (1983) (citing Pennsylvania v. Mimms, 434 U.S. 106 (1977) and Adams v.

31

Williams, 407 U.S. 143 (1972)). This is because "danger may arise from the possible presence of weapons in the area surrounding a subject." Id. at 1048.

> When, during already dangerous traffic stops, officers must approach vehicles whose occupants and interiors are blocked from view by tinted windows, the potential harm to which the officers are exposed increases exponentially, to the point . . . of unconscionability. . . . If, as the [Supreme] Court has noted, officers face an "inordinate risk" every time they approach even a vehicle whose interior and passengers are fully visible to the officers, Mimms, 434 U.S. at 110, the risk these officers face when they approach a vehicle with heavily tinted windows is, quite simply, intolerable.

United States v. Stanfield, 109 F.3d 976, 981-82 (4th Cir. 1997); see also United States v. Thomas, 363 F. Supp.2d 84, 92 (D. Conn. 2005).

In Mimms, the Supreme Court held that the "inordinate risk" that exists each time an officer approaches a person seated in an automobile justifies a bright-line rule that drivers may be ordered out of their vehicles during lawful traffic stops, without regard to whether there are particular circumstances that suggest some special danger to the officer making the stop. 434 U.S. at 110. In reaching this conclusion, the Court characterized the "additional intrusion" imposed by an order to get out of the car "as de minimis . . . at most a mere inconvenience [that] cannot prevail when balanced against legitimate concerns for the officer's safety." Id. at 111; see also, Stanfield, 109 F.3d at 980. In Wilson, the Mimms rule was clarified to establish that officers may

order all occupants, as well as the driver, to exit lawfully
stopped vehicles.  519 U.S. at 415.  As the Supreme Court
explained, "danger to an officer . . . is likely to be greater when
there are passengers in addition to the driver in the stopped car."
Id. at 414.

    As explained earlier, however, in this case the officers did
not merely order Ramos and Mehia out of the van.  O'Hara was unable
to see Mehia's hands and was, as he had been taught, reasonably
concerned that Mehia might have a weapon or a device that could be
used to detonate explosives.  Moreover, because the tinted windows
prevented him from seeing the passengers in the back of the van,
like the officers in Stanfield, O'Hara did "not know whether he
[was] about . . . to be ambushed by a car-full of armed
assailants."  109 F.3d at 981.  Therefore, O'Hara opened the front
passenger side door in order to get a clear view of Mehia's hands
and a view of the back seat passengers, and asked "What are you
guys doing here?"

    The opening of the door was an escalation of the intrusion
imposed by the "stop" of the vehicle.  However, the officers were
entitled to order the occupants out.  See Wilson, supra; Mimms,
supra.  Opening the passenger door was, at most, a slight increase
in the intrusion on the defendant's Fourth Amendment interests that
the Supreme Court characterized in Mimms as "de minimis."  In view
of the danger presented by O'Hara's inability to see Mehia's hands

or the passengers in the back of the van, opening the door was "fairly responsive to the emerging tableau – the circumstances originally warranting the stop, informed by what occurred, and what the officer learned, as the stop progressed." Chhien, 266 F.3d at 6.

In essence, the instant case is analogous to Stanfield, in which the Fourth Circuit wrote:

> [W]henever, during a lawful traffic stop, officers are required to approach a vehicle with windows so heavily tinted that they are unable to view the interior of the stopped vehicle, they may, when it appears in their experienced judgment prudent to do so, open at least one of the vehicle doors and, without crossing the plane of the vehicle, visually inspect its interior in order to ascertain whether the driver is armed, whether he has access to weapons, or whether there are other occupants of the vehicle who might pose a danger to the officers.

109 F.3d at 981. As the Fourth Circuit went on to explain, "the actual invasion of privacy entailed in an officer's opening of the vehicle door is indistinguishable from, if not precisely the same as, that which occurs where an occupant is required to open a door to exit a vehicle pursuant to an order given under the authority of Mimms or Wilson." Id. at 983; but see State v. McGuire, 695 N.2d 904 ***3 ***4 (Wis. Ct. App. 2005) (table decision).[6]

---

[6]In State v. McGuire, supra, the Wisconsin Court of Appeals stated that "there is a significant difference between ordering one out of a car and opening a car door without warning . . . . Suddenly opening a car door is unconstitutionally intrusive because the police officer thereby surprises the occupant when the latter is entitled to consider his private affairs secure from outside scrutiny." At least in the circumstances of the instant case, this court respectfully disagrees.

When O'Hara did not receive an immediate response to his question "What's going on here?," he merely exercised the right he already had under <u>Mimms</u> and <u>Wilson</u> to order the driver, Ramos, and the passengers, including Mehia, out of the van. This was, pursuant to those precedents, plainly permissible.[7]

When, as here, the required reasonable, articulable suspicion exists to justify a stop and an order that the driver and his passengers exit a vehicle, the officers may detain those

---

[7]Contrary to defendants' contention, the instant case is distinguishable in material respects from <u>United States v. Espinoza</u>, 433 F.Supp.2d 186 (D. Mass. 2006), <u>aff'd</u>, 490 F.3d 41, 46 (1st Cir. 2007). In <u>Espinoza</u>, the district court found there were insufficient facts to establish reasonable, articulable suspicion where: a van with Texas plates was traveling on a Massachusetts highway; it was registered to someone whose name had surfaced in a human smuggling investigation; two or three similar vans had been used in transporting illegal aliens in the Boston area; Boston was not a place generally associated with smuggling of illegal aliens; and the officer who made the stop "observed nothing unusual . . . about the van's operation during his surveillance." 490 F.3d at 47. The First Circuit found that "the district court's inferences, though not compelled by the facts, were nevertheless reasonable." <u>Id.</u> at 48. It affirmed, stating that "the record yields no definite and firm conviction that the district court's conclusion was mistaken." <u>Id.</u>

In contrast, in the instant case it was very unusual for people to remain in a vehicle in the Sullivan Square parking lot; the use of a paper license plate was suspicious, and the fact that it was a Texas plate was unusual and magnified its suspicious nature; the officers' concern was about the grave threat of a terrorist bombing, not the less dangerous crime of smuggling illegal aliens; after 9/11 and the then recent bombing of the Madrid train station, a mass transit facility was considered to be a particularly attractive and vulnerable terrorist target; and a van is a vehicle with the capacity to carry explosives. These distinctions between <u>Espinoza</u> and the instant case make a difference in the determination of whether the required justification for a <u>Terry</u> stop existed here.

individuals and question them to ascertain their identity.
"Obtaining a suspect's name in the course of a Terry stop serves
important government interests." Hiibel v. Sixth Judicial District
Court of Nevada, Humboldt County, 542 U.S. 177, 186 (2004). The
Supreme Court's decisions:

> make clear that questions concerning a suspect's identity
> are a routine and accepted part of many Terry stops. See
> United States v. Hensley, 469 U.S. 221, 229 (1985)
> ("[T]he ability to briefly stop [a suspect], ask
> questions, or check identification in the absence of
> probable cause promotes the strong government interest in
> solving crimes and bringing offenders to justice"); Hayes
> v. Florida, 470 U.S. 811, 816 (1985) ("[I]f there are
> articulable facts supporting a reasonable suspicion that
> a person has committed a criminal offense, that person
> may be stopped in order to identify him, to question him
> briefly, or to detain him briefly while attempting to
> obtain additional information"); Adams v. Williams, 407
> U.S. 143, 146 (1972) ("A brief stop of a suspicious
> individual, in order to determine his identity or to
> maintain the status quo momentarily while obtaining more
> information, may be most reasonable in light of the facts
> known to the officer at the time").

Id.

As described earlier, in response to a request for
identification, Ramos provided his Texas driver's license. He also
produced a passenger manifest. The passengers who were in the back
of the van responded to the request for identification by producing
Brazilian passports which lacked visas or immigration stamps
showing that they had lawfully entered the United States. They did
include stamps showing that those individuals had entered Mexico.

At this point the MBTA officers did not intend to allow Ramos

and Mehia to leave and a reasonable person in their positions would
have understood this.   They were, therefore, in custody and,
although not told so by the officers, under arrest.   See Berkemer
v. McCarty, 468 U.S. 420, 441-42 (1984); United States v. Young,
105 F.3d 1, 7 (1st Cir. 1997).

The information that the MBTA officers had provided probable
cause to believe that the passengers from Brazil were illegal
aliens, and that Ramos and Mehia were part of a conspiracy to
transport them unlawfully.   Therefore, the officers were justified
in arresting Ramos and Mehia, and turning them over to the
immigration agents.   See United States v. Brown, 500 F.3d 48, 56-57
(1st Cir. 2007) (Terry stop can generate enough evidence to provide
probable cause for warrantless arrest).

In view of the foregoing, the conduct of the MBTA officers at
the Sullivan Square station was reasonable and did not violate
either defendants' Fourth Amendment rights.   Therefore, their
motions to suppress the evidence derived from the officers'
investigation is being denied.

B.   Ramos' Motion to Suppress the Statements He Made
     at the MBTA Police Headquarters is Moot

As explained earlier, Ramos, but not Mehia, moved to suppress
the statements that he made at the MBTA police headquarters on the
additional ground that he was then in custody but was not advised
of his Miranda rights before being questioned.

The government concedes that Ramos was in custody while at the

37

MBTA police headquarters.  It suggests that the questions put to Ramos by ICE agent Lindstrom concerning his name, citizenship, medical condition, and ownership of the wallet might be admissible under the "routine booking" question exception to <u>Miranda</u>.  <u>See</u> <u>United States v. Doe</u>, 878 F.2d 1546, 1551 (1st Cir. 1999). However, the government represents that it will not seek to introduce at trial evidence of Ramos' statements at the MBTA police headquarters.  Therefore, this issue is moot.[8]

> C.  <u>The Questioning of Ramos at the ICE Office Was Lawful</u>

Ramos asserts that he did not understand and knowingly waive his <u>Miranda</u> rights, the questioning of him at the ICE office was therefore unlawful, and, accordingly, the statements he made there to the ICE officers must be suppressed.  This contention is incorrect.  The court finds that Ramos understood, and knowingly and voluntarily waived his <u>Miranda</u> rights, including his right to remain silent and his right to have an attorney present for the questioning to which he consented.

An individual may knowingly, intelligently, and voluntarily

---

[8]Ramos does not contend that the physical evidence seized from him at Sullivan Square station should be suppressed because of the statements allegedly obtained unlawfully from him at the MBTA police headquarters.  Rather, he asserts that such evidence should be suppressed if the purported <u>Terry</u> stop was unlawful. <u>See</u> Ramos Post-Hearing Mem. At 31.  As the stop at Sullivan Square station was lawful and produced the physical evidence, including Ramos' wallet, before the questioning at the MBTA police headquarters, that physical evidence will be admissible if a proper foundation linking it to Ramos is laid.  <u>See</u> Fed. R. Evid. 104(a).

waive his <u>Miranda</u> rights and answer questions without an attorney. <u>See</u> <u>Miranda v. Arizona</u>, 384 U.S. 436, 479 (1966). However, unless the government demonstrates, by a preponderance of the evidence, that the required warnings have been given and have been knowingly, intelligently, and voluntarily waived, it may not introduce at the trial of the interrogated individual any evidence obtained from its questioning. <u>See</u> <u>id.</u> at 475; <u>Colorado v. Connelly</u>, 479 U.S. 157, 168 (1986); <u>United States v. Earle</u>, 473 F. Supp. 2d 131, 135-137 (D. Mass. 2005).

It is not sufficient for a law enforcement officer merely to read a person his <u>Miranda</u> rights. <u>See</u> <u>United States v. Christian</u>, 571 F.2d 64, 67-68 (1st Cir. 1978). The government has an obligation to assure that the suspect understands those rights and "that the accused, knowing his rights, voluntarily relinquishes them." <u>United States v. Porter</u>, 764 F.2d 1, 7 (1st Cir. 1985); <u>see also</u> <u>Earle</u>, 473 F. Supp. 2d at 136.

A voluntary, intelligent, and knowing waiver occurs only where two distinct requirements are satisfied:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the "totality of the circumstances surrounding the interrogation" reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the <u>Miranda</u> rights have been waived.

Moran v. Burbine, 475 U.S. 412, 421 (1986).

The circumstances to be considered in deciding whether a waiver was knowing and voluntary must, of course, be proven by the evidence.  Ramos submitted an affidavit in support of his motion to suppress.  However, he declined to testify at the suppression hearing.  The government, therefore, did not have an opportunity to cross-examine Ramos.  Thus, it moved to strike his affidavit.

"At a suppression hearing, the court may rely on hearsay and other evidence, even though that evidence would not be admissible at trial."  United States v. Raddatz, 447 U.S. 667, 679 (1980). However, the court has the discretion to strike the affidavit of a defendant who invokes his Fifth Amendment right to remain silent and refuses to answer questions on cross-examination.  See United States v. Baskin, 424 F.3d 1, 3 (1st Cir. 2005); United States v. Sanchez, 535 F.Supp.2d 216, 224 n.8 (D. Mass. 2008) (noting that the discretion established in Baskin applies when the defendants do not testify at all).

At the suppression hearing, the court expressed the intention not to consider either defendants' affidavit because the government was not being given an opportunity to cross-examine them on the statements in those affidavits.  On further reflection, however, the court has decided to exercise its discretion to consider the affidavits. Nevertheless, Ramos' statements have been given little weight, in part because the government did not have an opportunity

40

to cross-examine him, but in larger measure because the testimony of the ICE agents which contradicts Ramos proved to be credible.

Ramos's affidavit describes the events at the Sullivan Square station in a manner that is substantially consistent with the testimony of O'Hara. Aug. 27, 2005 Ramos Aff. at 1. However, the affidavit provides some information that places in dispute the testimony of Davies and Bassett regarding the interrogation of Ramos at the ICE office. Ramos states that during this interrogation he was not "told anything about his rights" until after a female officer had asked him several questions, just prior to being asked to sign a sworn statement. Id. at 2. In addition, the affidavit states "at the time [of the ICE interrogation] I did not understand that I could have a lawyer with me while the police were questioning me." Id. at 2.[9]

As described earlier, the court finds that Bassett correctly read Ramos his Miranda rights in Spanish from a card that she carried. She asked Ramos if he understood those rights, which included the right to remain silent and the right to have an attorney present for any questioning. Ramos stated, in some form of words, that he understood those rights. He also stated that he

_____

[9] Mehia has also submitted an affidavit. Mehia's affidavit states facts that are not in dispute: Mehia was the passenger of the van when an officer knocked and opened the door without permission. Jan. 11, 2007 Mehia Aff. Because Mehia's affidavit does not add any disputed facts and does not alter the motion to suppress analysis, it is unnecessary to strike it.

was willing to answer some questions.

Bassett's Spanish was functional though not completely fluent. The court finds that no error occurred in her reading of Ramos' Miranda rights in Spanish.  Moreover, "translation of a suspect's Miranda rights need not be a perfect one, so long as the defendant understands that he does not need to speak to the police and that any statement he makes may be used against him." United States v. Hernandez, 913 F.2d 1506, 1510 (10th Cir. 1990).  At worst, this is such a case.

The court recognizes that the administration of the Miranda warnings to Ramos was far short of a model of highly professional police work.  There is no evidence that Ramos had been administered Miranda warnings on any earlier occasion.  Compare United States v. Burrous, 147 F.3d 111, 116-17 (2d Cir. 1998) (oral waiver of Miranda rights valid in part because defendant had received warnings a month before).  The warnings were only read to Ramos once.  Although it would have been easy to do so, he was not given the card with the warnings in Spanish to read himself. Compare United States v. Gonzales, 749 F.2d 1329, 1336 (9th Cir. 1984) ("Even if [the police officer] spoke very poor Spanish and appellant spoke very poor English, the written Spanish would have conveyed to appellant a sufficient understanding of his rights."); United States v. Villegas, 928 F.2d 512, 518-19 (2d Cir. 1991) (affirming district court finding of waiver by Spanish-speaking

42

defendant when officer read from Spanish <u>Miranda</u> card, defendant appeared not to understand, Spanish-speaking co-defendant read the card, defendant answered "yes" to the questions on the card, the defendant was handed the card and appeared to read it himself, and then nodded affirmatively).

Nevertheless, the government has met its burden of proving that Ramos knowingly and intelligently waived his <u>Miranda</u> rights. "An express . . . oral statement of waiver of the right to remain silent or of the right to counsel is usually strong proof of the validity of that waiver . . . ." <u>North Carolina v. Butler</u>, 441 U.S. 369, 373 (1979). Here, despite the minor inconsistencies in their memories of the words Ramos used, both Bassett and Davies testified that Ramos gave affirmative responses when Bassett asked him if he understood his rights and wanted to speak to the officers. The court believes their testimony that his response to each question was affirmative, and finds it persuasive. <u>See</u> <u>United States v. Vega-Santiago</u>, 519 F.3d 14, 22 (1st Cir. 2007) (affirming finding of valid <u>Miranda</u> waiver when trial court credited police testimony that they read the defendant his rights from a card and the defendant executed a written waiver).

In addition, the court finds that Ramos communicated with Bassett sufficiently well in Spanish to permit an interview to be conducted for almost two hours on several substantial subjects. This interview contributes to the finding that Ramos was able to

43

understand Bassett as she read the Miranda card and would have been able to communicate with her if he had questions, did not understand those rights, or did not want to speak to the agents without a lawyer. Cf. Campaneria v. Reid, 891 F.2d 1014, 1020 (2d Cir. 1989) (finding the record, including evidence of an interview between officer and defendant in English, demonstrated that the defendant's "command of English was sufficient for him to have understood the Miranda warnings given to him"). Bassett's significant training in the Spanish language and her recent residence and employment in a Spanish-speaking country provides further support for this conclusion.

In concluding that Ramos understood and properly waived his Miranda rights, the court does not rely at all on the handwritten waiver form in English that he signed. The government has not proven that Ramos was able to read the form. Moreover, the form did not fully or properly describe a person's Miranda rights. It was phrased as garbled statements, not questions: "Dou [sic] understand your rights" and "Do you wish to speak with these officers without your lawyer present."

Nevertheless, a written waiver of Miranda rights is not required. See United States v. Garcia, 983 F.2d 1160, 1168-70 (1st Cir. 1993) (affirming a finding of valid Miranda waiver when an officer merely inquired orally whether the defendant wished to speak, but did not obtain a waiver form). In essence, the court is

44

persuaded by the testimony of Bassett and Davies that Ramos was read his <u>Miranda</u> rights correctly in Spanish, by an agent who communicated comfortably with him in Spanish for almost two hours, after Ramos accurately stated that he understood those rights and was willing to speak to the agents.    In the circumstances, the court concludes that Ramos' contrary contentions are not credible. Therefore, his motion to suppress based on an alleged violation of his <u>Miranda</u> rights is not meritorious.


IV.  ORDER

In view of the foregoing, it is hereby ORDERED that:

1.  Defendants Edgar Ramos and John Mehia's motion to suppress (Docket No. 38) is DENIED.

2.  Counsel for the parties shall confer and, by September 30, 2008, report whether a trial will be necessary.

3.  If a trial will be necessary, the parties shall, by October 8, 2008, provide any updates of their previous pretrial submissions.

4.  A pretrial conference will be held on October 17, 2008, at 3:00 p.m.

5.  Trial will commence on November 17, 2008, at 9:00 a.m.


                              /s/ MARK L. WOLF
                              UNITED STATES DISTRICT JUDGE