UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 04-10198-MLW |
| | ) | |
| | ) | |
| EDGAR RAMOS | ) | |

DEFENDANT'S SENTENCING MEMORANDUM

INTRODUCTION

Edgar Ramos pled guilty on December 5, 2008 to a one-count indictment charging him with transport of illegal aliens.  Mr. Ramos requests that the court impose a sentence of time served (70 days) followed by 2 years of supervised release.  This sentence is "sufficient but not greater than necessary" to achieve the four purposes of sentencing set forth in 18 U.S.C. § 3553(a)(2) under the circumstances of this case, which include: (1) that the owner of the company who had a much more serious role in the present case was not prosecuted; (2) that the three level enhancement due to the number of illegal aliens transported should not be applied because it is not based upon empirical evidence or national experience; (3) that after residing in the United States for 18 years, he is now subject to mandatory deportation; (4) that due to his immigration status if Mr. Ramos is sentenced to BOP he will be subject to more onerous conditions than United States citizens; (5) that Mr. Ramos did not act with full knowledge that his passengers were illegal, rather acted in

disregard of that fact and; (6) that Mr. Ramos has no prior record and is unlikely to recidivate. United States v. Kimbrough, 128 S.Ct. 558 (2007); United States v. Booker, 125 S.Ct. 738 (2005); United States v. Martin, 520 F.3d 87 (1st Cir. 2008); United States v. Rodriquez, 527 F.3d 221 (1st Cir. 2008).

## ARGUMENT

### The Guidelines and the Applicable Sentencing Standard

The Sentencing Guidelines no longer are binding on the Court. United States v. Booker, 125 S.Ct. 738 (2005). Instead, under 18 U.S.C. § 3553(a), the Court should impose a sentence that is "sufficient but not greater than necessary" to achieve the four purposes of sentencing set forth in Section 3553(a)(2). In so doing, a sentencing court "may not presume that the Guidelines range is reasonable" but instead must, using the factors set forth in § 3553(a), "make an individualized assessment based on the facts presented." Gall v. United States 128 S.Ct. 586, 596 (2007). Thus, district courts are now permitted to and, in the appropriate case, directed to consider whether disagreement with the Sentencing Commission's underlying policy results in a sentence that is unreasonably high. Kimbrough, supra, 128 S.Ct. at 575; United States v. Boardman, 528 F.3d 86 (1st Cir. 2008); Martin, supra, 520 F.3d at 93-94.

The First Circuit recently elaborated on the meaning and breadth of the so-called parsimony principle in <u>United States v. Yonathan Rodriguez</u>, 527 F.3d 221 (1st Cir. 2008).  In <u>Rodriquez</u>, the First Circuit stressed that the Supreme Court ruling in <u>Kimbrough</u> requires a "more holistic inquiry" and that "section 3553(a) is more than a laundry list of discrete sentencing factors; it is, rather, a tapestry of factors, through which runs the thread of an overarching principle."  <u>Id</u>. at 228.  That overarching principle is to "impose a sentence sufficient but not greater than necessary."  <u>Id</u>.  In reaching a decision on what constitutes an appropriate sentence, the district court should "consider all the relevant factors" and "construct a sentence that is minimally sufficient to achieve the broad goals of sentencing."  <u>Id</u>. (emphasis added).

The Probation Department has determined that Mr. Ramos has a Criminal History Category of I (no Criminal History points) and that his guideline sentencing range is 8-14 months.  In this case, the 8-14 months guideline sentencing range suggested by probation should be given minimal weight in determining the sentence Ramos receives; instead, the now-familiar § 3553(a) factors dictate a sentence of time served (70 days) followed by 2 years of supervised release.

>    1.  Nature and circumstances of the offense and the history and characteristics of the defendant (§ 3553(a)(1)).[1]

**Defendant's Background**

Mr. Ramos is a 36 year old man who immigrated to the United States when he was eighteen to seek employment and a better life. Since his arrival he has worked hard and been a productive member of society. Mr. Ramos is a permanent resident alien.

Mr. Ramos, who is the oldest of eight children, grew up in poverty in Tamaulipas, a small town in Mexico. The house in which he was raised was a small shack which was located on the farm where his father worked. The family home did not have hot water until 2004. When Mr. Ramos was ten years old, he began to work with his father on the farm tending the goats and sheep.

Unfortunately, the emotional environment in which Mr. Ramos was raised was unstable. His father was violent and was physically abusive to the entire family. His father regularly beat his mother with objects such as a fan belt from an automobile. When he was seventeen he was unable to endure the violence anymore and intervened during a time when his father was hitting his mother. Despite the abuse, his mother sided with his father against him. As a result Mr. Ramos left the family home

---

[1] The facts are gleaned from the Presentence Report of January 23, 2009; and letter of support from Tomasa Ramos (translated from Spanish) attached as Addendum A.

and high school where he was in his senior year and went to live with his grandmother in San Luis Potosi, Mexico. At age eighteen, he left Mexico for the United States.

By the time he was nineteen, Mr. Ramos was living in Houston, Texas and working full time as a laborer in construction. He left that job for better wages in a marble factory. Ultimately he became a marble installer. More recently he acquired his commercial driver's license (CDL) and has worked as a truck driver. Throughout his time in the United States Mr. Ramos has maintained employment and worked hard. This is evident from his work history as well as from his taxed social security earnings.

At age twenty-three he began a relationship with Tomasa Hernandez and in 1998 they married. Ms. Hernandez is a United States citizen. Ms. Hernandez has a daughter Patricia Carrion, Ramos's stepdaughter, who is nineteen and attends the University of Texas at Denton on a full scholarship.

In 2000, Mr. Ramos and his wife purchased a home in Balch Springs, Texas. Unfortunately, in 2003 they fell upon hard times and were unable to continue to make the mortgage payments which resulted in the home being foreclosed upon. Since that time, Mr. Ramos and his wife have lived in various rental properties. While he and his wife are hard workers, they do not make

significant amounts of money and have struggled with debt. As a result, they are only able to live in low-income areas.

While this case was pending, Mr. Ramos suffered a heart attack. On the day of the attack, an emergency angioplasty procedure was performed in which a stent was installed to prevent the artery from re-narrowing. Since 2008 he has been treated for high blood pressure and high cholesterol. He is scheduled for a nuclear cardiac procedure in July 2009 to help diagnose the seriousness of his heart condition.

Mr. Ramos's wife Tomasa works as an assembler at an electronics factory making 10.50 an hour. She has some significant health problems, including that she is losing her vison due to diabetes. Due to her failing health she is at times unable to work.

### **Nature and Circumstances of the Offense**

Mr. Ramos's role in the offense was that he was hired as a driver for Oxford Tours to drive passengers from Dallas, Texas to various venues in the Northeastern United States. He was given a list of passengers to be transported. He was told to pick up the passengers at a gas station in Dallas, Texas. He had no control over the list or the number of people he was transporting. He did not know ahead of time where the passengers were coming from or where they were going. He was to be paid approximately 500.00 for a lengthy journey. He was not paid per passenger.

> 2. The need for the sentence to "reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense" (§ 3553(a)(2)(A)).

A sentence of 70 days followed by 2 years of supervised release is severe and adequate to reflect the goal of this factor.

> 3. The need for the sentence "to afford adequate deterrence to criminal conduct" (§ 3553(a)(2)(B)).

A sentence of 70 days followed by 2 years of supervised release for this man who has never been incarcerated before provides a strong deterrent.

> 4. The need for the sentence "to protect the public from further crimes of the defendant" § 3553(a)(2)(c).

A sentence of 70 days followed by 2 years of supervised release is adequate to protect the public from further crimes of the defendant.  It is anticipated that Mr. Ramos will ultimately be deported to Mexico as the offense of conviction requires mandatory deportation.

> 5. The need "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner" (§ 3553(a)(2)(D)).

Mr. Ramos suffered a heart attack during the pendency of this case.  He is under the medical care of Dr. Mallick at Dallas Regional Medical Center.  He is scheduled for a nuclear cardiac procedure in July 2008 to help diagnose the seriousness of his heart condition.

6. <u>The "kinds of sentences available" (§ 3553(a)(3)).</u>

The sentence Mr. Ramos proposes, 70 days followed by 24 months supervised release, is available to the court.

7. <u>The "kinds of sentence and sentencing range" established under the Guidelines and "any pertinent policy statement" (§ 3553(a)(4) & (5)).</u>

The Probation Department has determined that Mr. Ramos has a Criminal History Category of I (zero criminal history points) and that his guideline sentencing range is 8-14 months.

There are three fundamental problems with applying the guidelines in this case (1) the disparity resulting from Mr. Ramos being charged and Alfonso Garza-Lopez, the apparent organizer, not being prosecuted; (2) the over-emphasis on quantity of illegal aliens who were transported; and (3) the failure to take into account the fact that due to his immigration status, Mr. Ramos will be held under more onerous conditions than a United States citizen.

In the present case Mr. Ramos is far less culpable than the unindicted Alfonso Garza-Lopez the owner of Oxford Tours.  Yet, Mr. Garza-Lopez was never charged in this case.  The result is gross disparity between Mr. Ramos, whose low-end guidelines call for incarceration of 4 months, followed by 4 months of community confinement or home detention and likely deportation, and Mr. Garza-Lopez who was not even prosecuted.

Here, Mr. Ramos was charged along with John Mehia with transporting illegal aliens. Mr. Ramos is clearly less culpable than the others who were involved in a complex smuggling operation which involved transporting the aliens from Brazil to Mexico and across the border into the United States. He is also less culpable than the others who were involved in receiving and harboring the illegal aliens prior to delivering them to the location where Ramos picked them up to be driven to the Northeast. Ramos is also less culpable than those to whom he had to report and to Alfonso Garza-Lopez, the owner of the business.

Mr. Garza-Lopez owned the company Oxford Tours and the van which Mr. Ramos drove. He made the arrangements with others to transport the illegal aliens, negotiated the prices, provided Ramos with a list of passengers and destinations, paid for the gas and tolls, and paid Ramos only about 500.00 for the trip. Mr. Ramos had no decision making authority. Mr. Ramos was merely one of several drivers for Oxford Tours the van company owned by Garza-Lopez and had only been working for the company for approximately three weeks.

Mr. Garza-Lopez, who was not charged in this case, was indicted in a much more serious case than Ramos's involving the smuggling and transportation of 72 Mexicans across the border from Mexico in to the United States. See indictment attached as Addendum B. He received a sentence of only 17 months custody to

be followed by three years of supervised release.  See judgment attached as Addendum C.  The First Circuit has recognized co-defendant disparity as grounds for a variance.  "[W]e have...recognized that district courts have discretion, in appropriate cases, to align codefendants' sentences somewhat in order to reflect comparable degrees of culpability-at least in those cases where disparities are conspicuous and threaten to undermine confidence in the criminal justice system."  United States v. Martin, 520 F.3d 87, 94 (1st Cir. 2008).  In this case the far more culpable person, Garza-Lopez was not even prosecuted, nor is there any indication that his actions in this case were treated as relevant conduct in the case in which he was prosecuted.  "[R]espect for the law diminishes if natural principles of justice, such as the principle that punishment should correlate with culpability, are ignored."  Id.

Mr. Ramos is subject to a 3-level enhancement due to the number of illegal aliens he transported.  This situation is analogous to the enhancements based upon quantity in the drug guidelines.  See Sentencing Order, United States v. Cabrera, Criminal No 06-10343-NG (July 25, 2008).  There as here, the Sentencing Commission has not explained how the number of illegal aliens transported is meant to measure offense seriousness, and how it correlates with the purposes of sentencing under 18 U.S.C. § 3553(a).

The original enhancement had been given <u>not</u> for numbers of aliens but for prior criminal history -- specifically, it gave a 2-level increase if the defendant had previously been convicted of smuggling, transporting or harboring an unlawful alien, or a related offense.  The change to the guideline, which would have only added a 2-level increase, was added in 1992 by Amendment 450.  The Reason for Amendment states that "Prior to this amendment, section 2L1.1 provided the same offense level for a defendant who smuggles, transports or harbors 1, 5, 25, 50, or any number of unlawful aliens."  Substituting the enhancement for the number of aliens was intended to be "a more direct measure of the scope of the offense."  The specific increases, however, were only explained as being "[c]onsistent with the Commission's general approach throughout the guidelines" [2] in that they allow for gradual increases as the numbers of aliens increase.  The Commission also noted that it expected the enhancement to work in conjunction with 3B1.1 (role in the offense).  It did not explain why it chose to increase sentences by 2 levels in cases involving between 6 and 24 aliens, by 4 levels in cases involving between 25 and 99 aliens, and by 6 levels in cases involving 100 or more aliens.

---

[2] For example, use of quantity as a proxy for the seriousness of the offense as in, e.g., 2B1.1 (fraud and theft) and 2D1.1 (drugs).

Amendment 543 later increased the enhancement from 2 levels to 3 for 6 to 24 aliens, from 4 to 6 for 35 to 99 aliens, and from 6 to 9 for 100 or more aliens.  This was done pursuant to a directive contained in the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, which specifically told the Commission to "increase the sentencing enhancement by at least 50 percent."  So in summary, the increases to the guidelines were not based upon empirical data or because of national experience, but because Congress told the commission to do it.  See <u>United States v. Kimbrough</u>, 128 S.Ct. 558 (2007).

In this case, the number of illegal aliens transported is not an adequate proxy for culpability.  In this case Mr. Ramos did not negotiate the fares, decide the number of passengers, or even know the number of passengers until he was given the passenger list.  Nor was he paid per passenger.  He did not stand to make significant money as the van driver.  Furthermore, he did not transport the passengers one at a time.  Rather, he drove a van which contained a number of people predetermined by someone else.  Indeed, Mr. Ramos knew only the bare minimum about what was going on and the leaders wanted it that way.  The events that occurred were controlled by others.  He was simply a driver who had worked for the company for three weeks.  The 70 days that he served reflects his role in this larger operation in which he was the equivalent of a mule.  In sum, Mr. Ramos was a courier

who had only a limited understanding of the bigger operation, who had no decision making authority, and who acted entirely at the direction of Alfonso Garza-Lopez. The gross disparity between Ramos's potential sentence and the uncharged owner/operator of Oxford Tours warrants a variance from the guidelines.

Furthermore, Mr. Ramos did not have actual knowledge that the aliens were illegal. Instead, he recklessly disregarded the fact that the individuals transported were illegal aliens not lawfully in the United States.

Finally, Mr. Ramos's conviction under 18 U.S.C. § 2252(a)(1) constitutes an "aggravated felony" under 8 U.S.C. § 1101(a)(43), so that he faces deportation pursuant to the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, 8 U.S.C. § 1227(a)(2)(A)(iii). As an alien in the custody of the Bureau of Prisons, he would face more onerous conditions of confinement than identically situated inmates who are American citizens, including ineligibility for placement in a minimum security facility or a community corrections center. United States v. Smith, 27 F.3d 649, 650-51 (D.C.Cir.1994). As an alien inmate he could also expect to continue to be detained in federal custody at the end of his sentence. These circumstances provide additional grounds for a downward departure or variance. United States v. Smith, supra, United States v. Ortega-Mendosa, 981

F.Supp. 694 (D.D.C.1997).  Contra: <u>United States v. Restrepo</u>, 999 F.2d 640, 644 (2nd Cir. 1993), cert. denied, 510 U.S. 954 (1993).

<u>CONCLUSION</u>

For the foregoing reasons, and after and considering all of the sentencing factors in 18 U.S.C. § 3553(a), Edgar Ramos requests that the Court impose a sentence of 70 days (time served) followed by 24 months of supervised release.

```
                              EDGAR RAMOS
                              By his attorney,

                              /s/ Catherine K. Byrne

                              Catherine K. Byrne
                                B.B.O. #543838
                              Federal Defender Office
                              408 Atlantic Ave., 3rd Floor
                              Boston, MA  02110
                              Tel: 617-223-8061
```

<u>CERTIFICATE OF SERVICE</u>

I, Catherine K. Byrne, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on March 24, 2009.

/s/ Catherine K. Byrne

Catherine K. Byrne